Hall v. Harris.

## HALL AND WIFE v. HARRIS AND OTHERS.

Where a deed of trust, on personal property, contains a stipulation, that until the sale shall be made, the grantor shall have the uninterrupted possession of it, it seems that the sale may be made by the trustee, though at public sale, without taking possession ; but if, in such a case, the grantor or person in possession of the property, should be claiming to hold it adversely to the trust, it would be the duty and right of the trustee to recover possession before selling.

It is not a valid objection, in a suit to enforce a trust, that the beneficiary is made a party ; on the contrary, the beneficiary seems to be a necessary party, in such a case.

It is competent for any one who was not a party to the suit, to impeach its effect, as to him, in any case of a lien acquired before the rendition of the judgment (institution of suit *in rem*.)

*Quere ?* Whether the law in this country ever gave the wife a tacit or legal mortgage on her husband's property, to re-imburse her for her extradotal or paraphernal property, delivered by her to her husband and by him converted to his own use.

It seems that the wife can enforce against her husband, in the Courts of this State, after the removal hither of themselves and property, a tacit or legal mortgage which was given to her, by the laws of the State where the marriage took place, against all her husband's property, to reimburse her for paraphernal property which was delivered by her to him and by him converted to his own use (before their removal ?) But she can have no preference over purchasers or creditors by special lien, of the husband, who claim by act done before she sues and obtains a judgment.

Appeal from Brazoria.　On the 20th of October, 1840, Hall executed a deed of trust to Harris & Pease, on certain slaves, to secure the payment of a debt to Alcorn.　The deed contained a power to sell, at public sale, when required by Alcorn, in case of failure of payment, and stipulated that " until such " sale, as is herein before mentioned, shall be made, the said " W. D. C. Hall, or his legal representatives, shall have the " uninterrupted use, possession and benefit of said property." The execution of said trust was afterwards stayed, by agreement, one half to the 1st of January, 1845, and the other half to the 1st of January, 1846.　On the 1st October, 1846, the appellees brought this suit to subject the trust property to the payment of the debt, and for that purpose, to enforce the de-

livery of the slaves to the trustees, in order that they might proceed to sell them, &c., alleging that they were in possession of the said W. D. C. Hall and Julietta, his wife, and claimed as the property of said Julietta; that Alcorn had requested the trustees to sell the slaves; and that the trustees had requested the defendants to deliver them up to be sold; which they refused to do.

The answer of Hall contained a demurrer, and is not otherwise important. The answer of the wife, among other matters not noticed by the Court, contained a plea to the effect, that she was married to the said W. D. C. Hall, in Louisiana, in 1821, and had certain extradotal or paraphernal property; that she delivered it to her husband who received and used the same for his own benefit; that by the laws of Louisiana she had a legal mortgage on all her husband's property to reimburse the same; and in 1845 she sued her husband for the same and recovered a judgment in the Brazoria District Court, for $5590 20-100, establishing a lien and legal mortgage on all her husband's property, on which judgment execution was issued and levied upon the slaves, in June 1845, and she became the purchaser. She made said proceedings a part of her answer.

The plaintiffs excepted to the said plea; and May 19th, 1851, their exception was overruled. At Fall Term, 1851, there was a trial, at which the facts, above stated as alleged on both sides, were proved. Verdict and judgment for the plaintiffs.

*Alexander & Atchison*, for appellants.

*E. M. Pease*, for appellees.

LIPSCOMB, J. The first point, presented for our consideration by the appellants' brief, is, the supposed error of the Court below, in overruling the exceptions of the defendants,

to the plaintiffs' petition and amended petition. They con-
tend that there is no cause of action set out in the petition;
that, by the terms of the deed of trust, Hall was entitled to
the possession, down to the sale, and that his possession was
a lawful possession until a sale had been made, and that the
possession by the trustees, before or at the sale, was not neces-
sary to the validity of a sale in the execution of their trust;
that the sale would have been valid, without their being in
possession of the trust property. This may be true as an ab-
stract question; because, then, Hall would have been held as
holding possession for the trustees, and his possession would
have been for their use. But when he sets up an adverse title,
to the title of the trustees, and claims under such title, as is
alleged in the petition, the principle does not apply; because,
then, he in effect disavows so holding the property, and dis-
claims the trust. The plaintiffs, in their petition, allege this
adverse claim of title and possession as being in Mrs. Hall,
under a sale and purchase by her, and that the defendants
have refused to give possession, though demanded. Under
such circumstances, the right of possession and title of the
trustees being denied, had they proceeded to sell the trust
property so encumbered by an adverse party, it would not have
been a faithful discharge of the trust; because it is not likely
that the property, so encumbered with an adverse possession
and title, would have sold for its fair value; and it is proba-
ble, it would not have raised an amount sufficient for the pay-
ment of the debt intended to be secured by it.

The two next exceptions are not supported by the record:
a want of a demand, and a want of averring that Alcorn, the
beneficiary in the deed of trust, had not requested the trustees
to proceed to execute the trust; both of these facts are alleged
in the petition of the trustees.

There is another exception, to the parties. It is insisted that
Alcorn, the beneficiary, is an improper party. This exception
is not well taken; because, when the title of the trustees was
disclaimed, and an adverse title set up, as alleged in the peti-

tion, his interest in the suit to enforce his rights, was material; but it is not perceived on what ground the defendants could object to his being a party to the suit, being a proceeding in chancery to enforce and execute a trust for his benefit; and, in such cases, all parties, to be affected by the result of the suit, ought to de made parties. Judge Story lays down the doctrine, on the subject of parties in suits of this kind, to be as follows, i. e. "The general rule in cases of this sort is, " that in suits respecting the trust property, brought either by or " against the trustees, the *cestui que trust*, or beneficiaries, as " well as the trustees also, are necessary parties. And when " the suit is by or against the *cestui que trust*, or beneficiaries, " the trustees are also necessary parties; the trustees have the " legal interest and therefore they are necessary parties; the " *cestui que trust*, or beneficiaries, have the equitable and ulti-" mate interest, to be affected by the decree, and therefore they "are necessary parties." (Story, Eq. Sec. 207.) That this is the general rule, and applicable to this case, there can be no doubt; and it will be found, in the subsequent Sections of the same author, that it has never been made an available objection, that the beneficiary has been made a party; and the exception is believed to be, under peculiar circumstances, to dispense with the making all of the trustees, or *cestui que trust*, parties, not to their being parties. (See Head v. Teynham, 57, note 4 to Section 209, Story, Eq., and note 4 to Sec. 210, same book.) To the objection that the suit is founded on a legal title, and the legal title being in the trustees, they may enforce that legal title, without the *cestui que trust*, we answer that the suit is brought to enable the trustees to execute a trust, and for its enforcement through a judicial decision, and distinctions between Common Law and chancery jurisdiction are unknown to our system of jurisprudence; and that further, even if the jurisdiction should be regarded as separate, which is not the case, the suit is to enforce a trust, and the execution of trusts has always been a most prolific branch of equity jurisprudence. We regard the *cestui que trust* as a

proper party in this suit; and there was no error in overruling the exception.

The last question, we propose noticing, is presented by the claim of Mrs. Hall, under a purchase made by her at Sheriff's sale under an execution, issued upon a judgment, obtained against her husband subsequently to the making of the deed of trust, sued on and sought to be enforced. The suit in which that judgment was obtained, was commenced long after the date of the deed of trust. The suit was brought by Mrs. Hall against her husband, to recover the value of certain separate property, or peculiar paraphernalia belonging to her, which had been sold by Hall for the benefit of his creditors, whilst residing in the State of Louisiana, where she had previously intermarried with him, on or about 21st March, 1821. In the petition, judgment is prayed for the value of such property, and that her claim should be enforced as a privileged mortgage on the property of her husband. There was a judgment rendered against the husband, and the Court decreed, " that, by the law of the contract, the plaintiff has a legal " mortgage and a privileged lien on all the property of her " said husband, for reimbursing the same ; and it further appearing to the Court, that the affairs of the said defendant, " are in an embarrassed condition, as alleged by the plaintiff, " it is ordered, adjudged and decreed by the Court, that the " said plaintiff be recognized as a privileged creditor, with a " lien on all of her said husband's property, for the restitution " of her extradotal or paraphernal property, to the amount " of her judgment, with legal interest from the date of its " rendition," &c. The judgment and the decree were permitted to be read in evidence, though objected to by the plaintiffs. It may be admitted, that between Hall and his wife, the judgment and decree, remaining unreversed cannot collaterally be impeached; it is *res adjudicata ;* but as to other parties, it is conclusive of no right or interest whatever, none others being parties to the suit, or notified of the pendency of the suit; and it is competent for all such, to impeach its ef-

fect, as to them, in any case of a lien acquired before the rendition of the judgment; and it may well be questioned, whether in its terms, it will embrace property that the husband had previously alienated, or on which he had given a specific lien. The decree subjects all of the property of the husband, to the satisfaction of the judgment; but does not assume to subject such property, community or separate, as he may have previously disposed of, or alienated. Now, the property, embraced in the deed of trust, was beyond his control, and not subject to execution against him, unless such execution was supported by a prior lien, to the date of the deed. No matter where the contract may have been made, or what may be the *lex loci contractus*, when a judgment is rendered in our Courts, it claims no different rule of construction or attribute from a judgment rendered on a contract made within the jurisdiction of our own forms. We cannot look to any other laws, than those of our own forum, to define its legal effect. This judgment, when so construed, would not affect or impair any previous lien; and the execution, sued out upon it, could not give to a purchaser under it, any right against such previous lien. Its being privileged and a preference given to it, would only amount to a preference, at most, over other judgments—as it has not assumed to embrace previous, specific liens, created by the husband.

If it was admitted, that by the laws of Louisiana, where the marriage was consummated, the wife held a tacit or legal mortgage upon the property of the husband and his future acquisitions, or all the property acquired by him, after he had coverted to his own use, the wife's paraphernal or extradotal property, to reimburse her therefor; yet, it is clear that such law could not operate or be enforced extra territorially, in a forum where the law was different. This privilege would not follow the parties, and subject property acquired within a different jurisdiction, where no such lien was recognized by the law of the forum. The marriage contract is not of such a character, as to embrace, as an essential element, that the legal

38

rights and incidents, secured by law at the date of the contract, shall never be changed, but to attach as vested rights, no matter where the parties may live, as long as the coverture may last. Whilst domiciliated in Louisiana, she could claim and have enforced, all the rights given to her by laws of that State; but, when she left the jurisdiction of that State, she could no longer claim the benefit of those laws, as a component part of her marriage contract. These principles are believed to be clearly sustained by the best elementary law writers. See Story's Conflict of Laws, Sec. 176; Saul v. His Creditors, 17 Martin, 593–4–5, 606–607. These writers distinguish the contract of marriage, from a contract for property; and a contract of an antenuptial character, stipulating that the rights of the parties shall be governed by a particular code of laws designated, has been held invalid. (Story, Conf. L. Sec. 176.) But we have the authority of our own Court, sustaining the same principle. In the case of McIntire v. Chappell, the marriage was consummated in the State of Tennessee, where the laws, at the time of the marriage, vested all the personal property of the wife in the husband. As a consequence resulting from the marriage, the husband took possession of the slaves, and, some time after, moved to this State and died. We held that his right being perfect in Tennessee, the slaves were not community property. If, however, he had acquired the property in Texas, although the marriage took place in Tennessee, it would have been community property. The principle is, that so far as rights have been perfected under the laws of the place where those rights have accrued, such rights will be sustained. Suppose, in the case of a marriage in Tennessee, the parties had removed to Texas and acquired property here, and the wife had died, would it have been for a moment contended, that because the marriage had taken place in Tennessee, the whole of the property would go to the husband, although acquired in this State, where property, so acquired, would, the one half thereof, go to the heirs of the deceased wife; nor would it be allowed by the Courts

in Tennessee, in a case where the parties entered into the marriage state in Texas, and removed into that State, and acquired property there, that it should be community property, because by the *lex loci* of the marriage, property, acquired during coverture, is held as community property. If it were considered that the laws of the place in force where the marriage was entered, were to form a part of the marriage contract, wherever the parties might be, in all cases of divorce from the bonds of matrimony, the divorce would be granted or refused according to the *lex loci contractus;* and the grounds on which a divorce was allowed or refused, would be almost as variant as we have States in the Union, and according to the different laws of the several countries, where the marriage was solemnized. In some, where a divorce is not allowed for any cause, it could not be allowed here. The same variety of rules would govern as to the right of the wife to divorce. If Mrs. Hall had sued her husband in Louisiana and, by obtaining judgment, fixed a lien upon the property of the husband, and the husband had then removed with his property to this State, her rights would have presented a different aspect. The laws of the State of Coahuila and Texas may, perhaps, have allowed a tacit or legal mortgage, under such circumstances, in favor of the wife. I am not prepared to say whether it was so or not. If it was so, I have no doubt that such law was virtually repealed shortly after the organization of the government of Texas by the Acts relating to mortgages and by the Act of January, 1840 ; introducing the Common Law and defining the marital rights. More than twenty years had elapsed from the accruel of her rights, if any, before she commenced action to enforce the supposed lien ; and more than three years after the Act defining marital rights, in 1840.

I have said, that if the tacit or legal mortgage as it is called, in favor of the wife, was ever the law of this country, it was virtually repealed. I infer so, from the fact that the first Legislature, directing how mortgages should be foreclosed on real and personal estates, dated 15th May, 1838, Hartley's Digest,

Article, 2503, makes no provision for such mortgages, nor recognizes such. The Acts of 1838 and 1840, and of '41, (Art. 2505, and Art. 2508,) are silent upon the subject of a tacit mortgage, and all point to mortgages on specific property. These Acts direct the mode of proceeding, in forclosing mortgages. The case of Mrs. Hall does not come under either of them. Nor has any of our Legislatures, on the subject of marital rights, noticed this tacit mortgage. The Act of January, 1840, defining marital rights, appears to provide both for the rights and remedies ; and it no where refers to this as a right, nor provides a remedy. We therefore conclude, that if the law ever did exist, it is virtually repealed. It would be absurd, that the Legislature should be so particular in directing how written mortgages should be given and enforced, and make no reference to a tacit mortgage, if such a thing existed, when the latter would be so eminently calculated to defraud honest creditors and purchasers. And the decree of this Court, in the case of Houston v. Crosby, (1 Tex. R. 203,) would be equally inconsistent, in holding it to be essential to sustain a lien, expressly given by deed and recorded in Mississippi, to bring home the notice of such deed, to the party claiming in opposition to it, if a tacit mortgage, unknown to any one but the parties, could, after a sleep of more than twenty years, be interposed against an innocent purchaser or creditor without notice.

The law of the State of Louisiana should not be sustained, on another ground. It is in contravention of the policy of our own laws. (See Story's Conflict, Chap. 2.) The main object of our registration laws is, to guard against a fraud upon innocent purchasers and creditors; and this policy would be defeated by sustaining the law of the State of Louisiana in relation to tacit mortgages. And this tacit mortgage is claimed to embrace, not the property, at the time of its accruel, in the possession of the husband, but even such as he may have acquired in this State. We do not know whether the same law ever was in force in Texas ; but we do know, that the law of

community, between the husband and wife, of the acquests and gains, during the coverture, was and still is in force, and that, by that law, the husband could alienate such community property; and all property acquired here during the marriage is presumed to be in that condition.

But, if it were admitted, that by the laws of Louisiana, where the marriage was contracted, the property of her husband became hypothecated for the restoration of her dotal portion, it would still be doubted, whether this hypothecation could follow her husband's property into another country. On this question, foreign jurists are much divided, as appears from the investigation of Judge Story; Rodenberg holding that the hypothecation could not operate beyond the jurisdiction of the *loci contractus*. (Story's Conf. Sec. 321 and 322.) The conclusion of that eminent jurist seems to be sustainable on principle; as it is clear, that the tacit mortgage is nothing more than a remedy to enforce the marriage obligation of the husband, to return or answer for the wife's paraphernal, or dotal property, and is not a part of the obligation itself; and it is universally conceded, that remedies are governed by the laws of the forum. It seems, however, that in general, a foreign lien will be regarded as valid, and enforced, so far as can be done conveniently, by the laws of the forum, on the principles of the comity of nations. But this comity is not to be extended to the prejudice of our own citizens, asserting rights acquired under our own laws. Hence, a priority or preference acquired as an incident to a foreign contract by the *lex loci contractus*, will not be enforced against those persons who had acquired rights under contracts made here. Judge Story says "the recognition of the existence and validity of such "liens, by foreign countries, is not to be confounded with giv- "ing them a superiority or priority over all other liens and "rights justly acquired in such foreign countries under their "own laws, merely because the former liens, in the countries "where they first attached, had there, by law or by custom, "such priority or superiority." (Story's Conf. Sec. 323.)

And Chief Justice Marshall, in Harrison v. Sterry, 5 Cranch, 289–298, makes the distinction. He says the law of the place where the contract was made, is, generally speaking, the law of the contract, *i. e.* it is the law by which the contract is expounded; but the right of priority forms no part of the contract; it is extensive, and rather a personal privilege, dependent upon the law of the place where the property lies, and where the Court sits, which is to decide the cause. (See, also, Story's Conf. Sec. 324 and 325.) In this aspect, it was unnecessary to inquire, whether the tacit mortgage was known to our law or not. Mrs. Hall could have rights against her husband, under the laws of Louisiana, but she could have no preference over third persons, who had acquired rights to the property of her husband; because that could not be done, without prejudice to such third persons. We believe, that whatever validity there may be in her claim against her husband, growing out of her marriage in Louisiana, or whatever priority might attach by the laws of Louisiana, as incident to her marriage, such priority cannot be sustained in this Court, against a lien acquired by the laws of this State, before the rendition of her judgment against her husband. Her judgment, therefore, interposed no legal defence to the action brought by the trustees and *cestui que trusts ;* and the judgment is affirmed.

Judgment affirmed.