22 479
74 215

## HENRY CASTRO AND OTHERS v. JOHN H. ILLIES.
## ANGELO CAUSICI AND OTHERS v. JOHN H. ILLIES.

When a judgment of the District Court is not superseded, upon prosecuting a writ of error, it authorizes the issuance of an execution; and it cannot affect the title of the purchaser, at the sale under it, that property was not sold under the decree, (a judgment of foreclosure of a mortgage,) to which the defendant had no title, and upon which the decree could not legally operate, or which was not subject to seizure and sale on execution, under the decree.

A judgment of foreclosure erroneously decreed the sale of land, not embraced in the mortgage, in lieu of a part of the mortgaged premises, for which the defendant's title had failed—from which judgment the defendant had prosecuted a writ of error, (without a supersedeas,) and the land, as decreed, having been sold under an order of sale, without satisfying the judgment, the plaintiff sued out executions, under which he purchased lands of the defendant, not included in the mortgage: *Held*, that the reversal of so much of the judgment of the District Court, as ordered the sale of the lands embraced in the mortgage, did not affect the title of the plaintiff to those purchased by him, under the executions.

In the absence of an express contract, the marital rights of persons married in other countries, who have become domiciled here, are to be governed, as to all after acquisitions of property, by the law of community of this State.

The general rule, irrespective of the effect of a change of domicil is, that where there is an express nuptial contract, "if it speak fully to the very point," it will generally govern all the property of the parties, not only in the domicil, but in every other place, under the limitations and restrictions which apply to other contracts. "It will act directly on movable property every where; "but as to immovable property in a foreign territory, it will at most only "confer a right of action, to be enforced according to the *lex loci rei sitæ*."

But where there has been a change of domicil, though there be an express contract, if it do not expressly provide, or the intention be not manifest, that it is to apply to and govern all after acquired property, wherever the parties may reside, it will not affect real property situate in the new domicil.

And such seems to be the rule with reference to personal property, in Louisiana; the decisions of whose courts, from the similarity of its former laws and legislation with our own, are entitled to the greater weight.

Where, in the contract, there is a reference to the law of the country, and a declaration of intention to be governed by its provisions, with certain modifications therein expressed, the inference would seem to be, that the parties did not contemplate a change of domicil, and did not contract with reference to their after acquisitions, in case of removal to another country.

But whatever may be the rights of the parties to such a contract, executed in the matrimonial domicil, as between themselves and their representatives, it cannot govern their real property, acquired and situate here, to the prejudice of the rights of other citizens, who have contracted on the faith of the property, and without notice of a contract establishing a rule for its government, variant from the law of the land.

And notwithstanding it was stipulated in such a nuptial contract, that there should not be a community in the future acquisitions of the spouses, where real estate was conveyed to the wife, after their removal to this State: *Held*, that the legal presumption applied with its full force, that it was community property; and that it devolved upon her to repel this presumption, by clear and satisfactory proof, that it was purchased with her individual money or means, if she claimed it as her separate property.

The doctrine of tacit mortgage cannot be invoked in this State, in favor of a wife against a creditor of the husband.

To sustain a conveyance, impeached for fraud, it is not enough that it be upon a good consideration; it must be *bonâ fide* also, and not made to hinder, delay, or defraud creditors.

When a wife is the beneficiary in a deed of conveyance from her husband, which is impeached by a creditor for fraud, from the relations of the parties, it is scarcely to be supposed, that the circumstances and intentions of the grantor were unknown to her.

When a contract has been admitted in evidence, and is before the jury for their consideration, the court may very properly decline to call their special attention to it, by instructions as to the weight to which it is entitled, or the purposes for which it may be used.

APPEAL from Bexar. Tried below before the Hon. Thomas J. Devine.

These suits were brought by Illies against Henry Castro and his wife, Amalie Mathias Castro, and Angelo Causici, for the recovery of a number of lots and tracts of land, described in the petition, and claimed by the plaintiff, Illies, under purchases made at sheriff's sales, by virtue of executions on a judgment rendered on the 25th of June, 1852, by the District Court of Bexar county, in favor of Illies against the defendant, Henry Castro. He also averred that the defendants, Causici and Amalie Mathias Castro, claimed the lands under two several trust deeds, executed by the defendant, Henry Castro, to Causici, for the said Amalie ; which deeds, he alleged, were fraudulent and void, and were made without consideration, with the intent to delay, hinder and defraud creditors. It was also alleged, that Mrs. Castro claimed one of the tracts of land sued for, as her separate property, under a deed from J. B. Lacoste to her, but that the said land was the community property of the said Henry Castro and wife.

The defendants answered, that the plaintiff's pretended title was null and void, inasmuch as the judgment under which the executions were issued, had been reversed by the Supreme Court ; that the said trust deeds were *bonâ fide*, and made upon a full and fair consideration, paid out of the separate property of Mrs. Castro ; that the land purchased from the said Lacoste, was also paid for with her separate moneys ; and that the marriage contract between them, entered into in the city of Paris, France, in 1813, was in full force, and formed the rule and law of her separate property, &c.

The pleadings set forth very fully the grounds relied upon by both parties, but this summary of them is believed to be suffi-

cient, for the proper understanding of the matters in controversy.

The two cases were submitted together to the jury, with an agreement that one verdict and judgment should be rendered in both of them.

It appeared, from the statement of facts, that there was a judgment rendered by the District Court of Bexar county, on the 25th of June, 1852, in favor of Illies, against Henry Castro, for $20,228 43, with a decree foreclosing two mortgages, given to secure the same, upon 52,500 acres of land; and it appeared, from the verdict in this case, that Castro's title to some of the lands, as described in the mortgages, had failed, or that he had acquired other lands in his (Castro's) colony, under the legislation had with reference to the said colony, in their stead. The District Court decreed that the lands owned by Castro, embraced in the mortgage, together with the other lands which it decreed had been substituted in place of those, for which his title had failed, should be sold in satisfaction of the judgment; and ordered execution to issue for any balance that might remain unpaid.

From this judgment, Castro prosecuted a writ of error to the Supreme Court, (without, however, superseding the judgment,) where so much of the judgment as ordered the sale of other property, than that embraced in the mortgages, was reversed, but as to all other matters, it was affirmed. It did not appear, from the record in this case, when the said writ of error was sued out; but from the statements in the brief, and the charge of the court, it was in August, 1853. The case was decided in the Supreme Court on the 21st of December, 1854, and is reported in 13 Tex. Rep. 229.

On the 8th day of June, 1853, an order of sale was issued by the clerk of the District Court of Bexar county, directing the sale of the lands as described in the judgment of the District Court; and on the 5th of July, 1853, the sheriff sold the whole of the said lands for the sum of $3,695 40.

On the 11th of July, 1853, an execution was issued on the

judgment, under which the sheriff, on the 4th of October, 1853, sold, as the property of the said Castro, other lands, not included in the mortgages, among which were those described in the first of these petitions, and which were purchased by Illies.

On the 10th of November, 1853, execution was again issued for the balance remaining unpaid upon the said judgment, under which the sheriff, on the first Tuesday in December, 1853, sold as the property of Castro, still other lands, not included in said mortgages, among which were the lands described in the petition in second of these causes, and which were also purchased by Illies.

The first of the said trust deeds was executed on the 20th of April, 1848, and was as follows:

"Know all men by these presents, that in consideration that "Henry Castro, of the county of Medina, State of Texas, for-"merly of the city of Paris, and kingdom of France, at the "time of his marriage with Amalie Mathias, his present wife, in "the year 1813, did receive of the said Amalie Mathias, 50,000 "frs., it being the separate property of his said wife, and which "of right belongs to her, together with legal interest, and which "the said Henry justly owes to the said Amalie Mathias: Now, "for the purpose of paying off and discharging that debt, the "said Henry Castro, of the first part, conveys, transfers, and "alienates unto Angelo Causici, in trust for his said wife, all "those tracts and parcels of land," &c. [Here followed the description of a number of tracts of land, among them those claimed by Illies, in the first of the above petitions, and also a tract afterwards conveyed by Castro and wife to Lacoste.] "All of which property is conveyed upon the following condi-"tions and restrictions: The said Amalie Mathias, on her part, "agrees that the said Henry Castro shall have the management "and control of said property during his lifetime, the rents and "profits to belong to the said Amalie Mathias, during her "natural life. It is further agreed, that said Henry Castro "may sell and convey said property, with the consent and "approbation of said Amalie Mathias, the proceeds thereof

"accruing to her. It is further agreed, by the said party of "the second part, the said Amalie Mathias, that she, on her "part, in consideration of this conveyance, releases her claim "to the said Henry Castro for the consideration of frs. 50,000, "so advanced to him. She further agrees, that in case of the "death of said Henry Castro, she will not sell or transfer said "lands and property during her lifetime, but will retain the "same, using only the rents and profits thereof; and at her "death, she will appoint the following named persons as her "heirs and leg.: Angelo Causici, Fiorella Causici, Lorenzo "Castro, and Orlando Castro, who, after her decease, shall take "and inherit said property, by equal portions, in their own "right. Given under our hands, and using scrawls for seals, "this 20th day of April, 1848.

"In presence of         "H. CASTRO,
    "DUBUIS,         "AMALIE MATHIAS,
    "P. M. LACOUSTRE.     "ANGELO CAUSICI."

On the 16th of February, 1853, the said Castro and his wife conveyed to J. B. Lacoste, in consideration of $2,493 38, one of the tracts embraced in the said trust deed; and on the 17th of February, 1853, Lacoste, in consideration of $1,221 38, paid him by Mrs. Castro, conveyed 280 acres to her, known as Castro's Bend, being that part of the said tract for which the plaintiff sued.

On the 11th of April, 1853, a second deed was executed by Henry Castro to Angelo Causici, in trust for his wife, Amalie Mathias Castro, in consideration, as stated in the deed, of the sum of $10,000, the separate property of Mrs. Castro, received by him at various times between the 20th of April, 1848, and the 11th of April, 1853, for rents and profits of the property conveyed to the said Angelo Causici, in trust for her, on the 20th of April, 1848. This deed conveyed, together with a large amount of other land, that claimed by plaintiff, Illies, under the last sheriff's sale, and sued for in the second suit.

The plaintiff proved, that the said suit of Illies v. Castro, under which he purchased at the said execution sales, was commenced on the 11th of April, 1847; that the defendant, Henry Castro, was hard pressed and embarrassed, and had been generally reputed to be so since 1846.

The ante nuptial contract between Castro and his wife, set up in the defendant's answer, was executed by them on the 3d of November, 1813, in the city of Paris, in the kingdom of France, and stipulated, among other things—"1st. There shall be no "community of property between husband and wife, who shall, "on the contrary, hold their property separate, and intend to "submit, excepting the following modifications, to the provi- "sions of the ninth section, part second, title fifth, of the law on "marriage contracts, included in the Code Napoleon." It was also stipulated that the wife should, agreeably to the provisions of the article 1536, of the "Code Napoleon," have the full administration of her real and personal property, and the free enjoyment of her income. The estate of the wife, as was stated, consisted of furniture and other movables, specified in an inventory attached to the contract, and amounted in value to frs. 54,300, of which, it was stipulated, the husband consented to remain in charge, by the fact of the celebration of the marriage. It was further stipulated, that the wife should be indemnified for all alienations of personal estate belonging to her, that might be made during the marriage, &c.

The defendants proved, that there were no judgments against Castro, at the date of the execution of the first trust deed; that Castro had, in 1843, personal property and money to a considerable amount; and that in 1856, he owned personal property and real estate, of the value of $22,000, besides his interest in his (Castro's) colony, which consisted of sixty sections of premium land, at ten cents per acre, worth $3,840; and one half of six hundred sections, 192,000 acres, at ten cents per acre, $19,200; and that from the increase in value of the real estate, the property was, as valued by the witness, in his answer to interrogatories, worth $187,700.

Upon the trial, the court instructed the jury—1st. "The "plaintiff, John H. Illies, sued the defendants, H. Castro, A. "M. Castro, (his wife,) and Angelo Causici, who he alleged "claim title to the property described in his petition, by certain "transfers or deeds of trust, which he averred were without "valid consideration and fraudulent; he prayed for damages, a "cancellation of the transfer from Lacoste to Mrs. Castro, and "a cancellation of the deeds of trust made to Causici, by Castro, "for the benefit of his (Castro's) wife.

"2d. The defendants deny the right of the plaintiff to recover, "and assert that plaintiff's claim or right is invalid, by reason "of the erroneous judgment and illegal executions, upon and by "virtue of which the sheriff's sales were made, under which "Illies claims title; and the defendants claim title, by transfer "from J. B. Lacoste to Mrs. Castro, and by two deeds of trust "from Henry Castro to Causici, for the benefit of the defendant, "A. M. Castro, the wife of Henry Castro, which deeds of trust, "it is alleged, were given in consideration of a marriage con-"tract entered into in France, between H. Castro and A. M. "Castro.

"3d. If you are satisfied, from the evidence, that the sheriff's "deeds, under which Illies claims, were executed in considera-"tion of a purchase, at sheriff's sale, made by Illies or his agents, "after due notice, and in accordance with law, you will say so, "and write it as a part of your verdict. If not, you will state "according to your conviction of the facts of the case.

"4th. If you believe that the transfer from J. B. Lacoste to "Mrs. Castro, of 280 acres of land, known as Castro's Bend, was "purchased with the money of Mrs. Castro, you will also write "it as a part of your verdict; or if, from the evidence, you "believe that this purchase was made by Mrs. Castro, with the "money of her husband, and for the purpose of hindering or "delaying creditors, then you will state that fact in your "verdict.

"5th. If you believe, from the evidence, that Castro was "indebted to Illies for means to carry out his colonization con-

"tract, and that the deeds of trust to Causici were made by "Castro, after such indebtedness in favor of Illies had accrued, "you will so state in your verdict; otherwise, the reverse.

"6th. If you believe, from the evidence, that the transfers "or deeds of trust by H. Castro, were made to Causici for the "benefit of Mrs. Castro and Causici, in good faith on the part "of Mrs. Castro, and for a valuable consideration, you will so "say as a part of your verdict.

"7th. If you believe that the said deeds of trust were made "for the purpose of hindering, delaying or defrauding Illies, or "other creditors, of their just debts or dues, and without con-"sideration, you will so say as a part of your verdict.

"8th. A sheriff's deed or deeds, are *primâ facie* evidence of "the regularity and validity of his proceedings, respecting the "sale or sales.

"9th. A marriage contract between Castro and his wife, in "France, is binding on him or her, or those claiming under or "through them; and such contract will, in general, be a valid "consideration for the transfer of property.

"10th. But the declarations by Castro, in the deeds of trust "to Causici, are not evidence as against Illies, that such, or "any other consideration, moved from his wife towards him, in "support of those deeds of trust.

"11th. With the suit commenced in 1848, and judgment "rendered in 1852, in favor of Illies, and against Castro, you "have nothing to do.

"12th. We have framed for your finding, five special issues, "numbered 3, 4, 5, 6 and 7, with the view of simplifying the "matters in controversy in this suit, and for the purpose of "enabling you, more readily and certainly, to arrive at such "opinions as will preserve the rights of all the parties in this "suit, and deciding all the important questions at issue between "them. You will and can carry into effect this intention, by taking "the issues in the order in which they are numbered, discussing "the issue, and settling down upon the finding that you agree "upon, as to such issue; then examining the next question or

"issue, deciding and writing out your finding on that point; "and then passing on to the next, and so on, in the order in "which they are numbered, to the last: upon the issues found "by you, the court will base its judgment."

On application of the plaintiff, the court also gave the following instruction: "Any purchase of property in the name of "a wife, during marriage, is presumed to be with the funds of "the community, and the property is presumed to be community "property, unless the wife proves the funds used in the purchase "were her separate funds."

The defendants asked that the following instructions should also be given to the jury:

"1st. If the jury believe, from the testimony, that the "executions under which the plaintiff caused to be sold the lands "in controversy, were issued and levied before the sale of the "land in the mortgage deeds had been sold under an order of "sale, Illies, the plaintiff in this cause, derived no title, by vir-"tue of such sale under said executions.

"2d. That the writ of error, having issued in the case of "Castro v. Illies, in August, 1853, and before the sales under "the executions, it was legal notice of the pendency of the writ "of error to Illies, and he purchased, subject to the decision of "the Supreme Court in the case.

"3d. That the property described in the mortgages from "Castro to Illies, and from Castro to Weisback, should have "been first sold; and any execution issued by virtue of the "decree of the District Court, and levying upon other lands, "and all sales made thereon to Illies, conferred no title on "Illies, as purchaser at such sheriff's sales.

"4th. That the marriage contract between Castro and wife, "furnishes the rule of property of husband and wife, and must "be interpreted according to the laws of France, then in opera-"tion.

"5th. That under the marriage contract, there is no com-"munity between Castro and wife, nor are either of the parties

"bound for the debts of the other; nor can the property of either "be sold for the debts of the other.

"6th. That by the contract of marriage between Castro "and wife, Castro became liable for the estimated value of the "property in the inventory, according to the estimate; and the "said estimate formed a good and valid consideration, for a "conveyance of property of like value.

"7th. That by virtue of the marriage contract, Castro be-"came indebted to his wife, in the full amount of the property "in the inventory, estimated according to the inventory, "whether the same was used by them in common or not.

"8th. That the marriage contract, without being recorded, "is in evidence before the jury, and may be taken into con-"sideration for the purpose of repelling the charge of fraud."

All of these charges the court refused to give.

The jury returned the following verdict:

"3. We the jury do agree, that the sheriff's deeds, under "which Illies claims, were executed in consideration of a pur-"chase at sheriff's sale, made by Illies or his agents, after due "notice, and in accordance with law.

"4. We also believe, from the fact that no proof in "evidence appeared to show that Mrs. Castro had any money "of her own, that the 280 acres, known as Castro's Bend, was "purchased with community funds.

"5. We also believe, from the evidence, that Castro was "indebted to Illies for means to carry out his colonization con-"tract, and believe that the deeds of trust to Causici, were made "by Castro, after such indebtedness had accrued.

"6. We also agree, that the deeds of trust, by H. Castro "to Causici, were made without a valuable consideration.

"7. We also agree, that said deeds were made for the pur-"pose of delaying Illies from collecting his just dues."

Judgment for the plaintiff. Motion by defendants for a new trial overruled; whereupon they gave notice of appeal.

*Wall* and *C. Upson*, for appellants. The following proposi-

tions seem first to present themselves for consideration; and being deemed so well settled, by the plainest principles of law, and the repeated decisions of this court, that it would be useless to give their demonstration, they are taken for granted :

1st. Illies's right to recover the lands in question, depends upon the validity of the sheriff's deeds, as he must rely upon the strength of his own title, and not on the insufficiency or illegality of that of the defendants : 2d. The validity of the sheriff's deeds depends upon the validity of the judgment, and executions, and the sales under them : 3d. If those deeds, though good and valid in themselves, convey no interest, as against the title set up by the defendants, Illies cannot recover.

Upon these propositions, the following questions arise : 1st. Were the judgments, and the executions and sales under them, valid or not ?  2d. If not, did Illies acquire any title thereby? 3d. And if he did, was it good, as against the title set up by the defendants ?  These questions are fully embraced by the 1st, 2d, 11th and 12th assignments of error.

The decision of this court, in the case of Castro v. Illies, 13 Tex. Rep. 229, with the judgment and decree of the court below, in that case, the order of sale and executions, and the returns of the sheriff thereon, which appear in the records of this case, seem conclusively to settle the first two questions in the negative, so far at least, as regards the lands in controversy in this suit.   Under the decision of this court in that case, the statutes of this State, and the well settled principles of law in this country, in regard to the satisfaction of judgments for the foreclosure of mortgages, all of the lands specified in the mortgage deeds, must first have been sold under an order of sale, or so much thereof as would have been necessary to satisfy the judgment, and the proceeds of such sale must first have proved insufficient to pay the judgment, before any valid execution could have been issued, to be levied on, or any legal sale made of Castro's other estate, under that judgment.   (Hart. Dig. Art. 773 ; Duty v. Graham, 12 Tex. Rep. 427 ; 4 Kent's Com. 8th ed. 194 ;  Code of Iowa, 290, §§ 2083, 2084, 2085 ;

Wilson v. McCullough, 19 Pa. State Rep. 77; 2 Hilliard on Mort. 38, 39.)

A foreclosure must be as to all of the mortgaged premises. (Spring v. Haines, 21 Maine Rep. 126.)

It must appear from the record, that the land mortgaged is the same as that mentioned in the decree. (3 Dana's Rep. 590.)

At the time of the issuance of the *alias* and *pluries* executions, under which the lands in question were sold, and of the respective sales under them, the only lands mentioned in the mortgage deeds, that had been sold, were those specified in the judgment and decree: hence, we say, both of those executions, and the sales under them, were absolutely void, and the purchaser could acquire no title therefrom.

We contend that the judgment and decree of the court below, could only have been legally executed in conformity with the decree of this court. The writ of error had been issued previous to those executions, and the sales under them, and the purchaser was bound to take notice of it.

And certainly, Illies could not claim even the protection thrown around an innocent or *bonâ fide* purchaser; being a party to the suit, he was bound to take notice of all the errors in the judgment, and in the proceedings under it. (Hubbell v. Broadwell, 8 Ohio Rep. 120; Harrison v. Rapp, 2 Blackf. Rep. 1.)

The answer, that the judgment and decree of the court below, at the time of the sales, was unreversed, can only shield a purchaser in good faith, where the judgment is simply erroneous, and, *à fortiori*, cannot apply in this case, as Illies was a party to the suit; and that portion of the judgment and decree, which ordered the sale of other than the mortgaged lands, before the sale of all the lands specified in the mortgage deeds, as well as the sale of all such other lands, was a nullity, and virtually so decided by this court, of which the world was bound to take notice; and a purchaser under them could acquire no title. "A purchaser at execution sale must show, not only the "execution under which the sheriff sold, but a judgment war-

"ranting the execution, &c. If what is offered as a judgment, "ordered what the court has not power to order, so that, upon "its face, the law can pronounce it null, it is not a judgment, "and the execution issued thereon will not protect the pur- "chaser." (Jennings v. Stafford, 1 Ired. Rep. 404.)

If the sales under the *alias* and *pluries* executions were good, upon the same principle, the sale of the *substituted lands* made in accordance with the judgment, must have been good, which is a doctrine not to be sustained.

If the positions we have thus far taken are correct, we apprehend this court need look no further, and should enter its decree, nullifying the sheriff's deeds under which Illies claims title, and here put an end to this controversy. If, however, this court shall determine the first two questions in the affirmative, to the effect that the sheriff's deeds to Illies are valid, then arises the third question to be disposed of—"Is Illies's title under those deeds good as against the title set up by the defendants?" which involves the validity of the deeds of April 20th, 1848, April 11th, 1853, and February 17th, 1853.

Let us first inquire as to the deed of April 20th, 1848, from Castro to Causici, in trust for his (Castro's) wife. That being the elder legal title, it must prevail, unless overborne by some prior equity in the appellee, or unless it be tainted with fraud. (1 Tex. Rep. 326.)

The only ground of objection to the appellant's title, relied on by the appellee, is, that the deeds were made in contravention of the statute of Frauds, and without valuable consideration.

At the time the deed of 1848 was executed, Castro had a large amount of property, to wit, of the value of between $40,000 and $50,000. There was then no judgment against him, and there is no evidence before this court, nor was there before the jury in the court below, that there were any debts existing against Castro at that time, excepting the claim of Illies; and as to that, and in repelling the charge of fraud, we may answer, that Illies at that time did not claim that Castro owed him

anything; but, on the contrary, contended that he had been paid by the conveyance of the 40,000 acres of land, and the assignment to him of the Weisback conveyance of 12,500 acres, and he so contended, until the court declared both deeds to be mortgages. At the same time, Castro did not acknowledge any indebtedness to Illies, but contended that Illies was entitled to, and was to receive, so much of the said lands, at forty cents per acre, as would satisfy Illies's just claim. This will be seen by reference to the original petition and answer in the case of Castro v. Illies, instituted in 1847. Illies's cross bill, admitting the deeds of conveyance to be mortgages, and praying their foreclosure, was not filed until July 6th, 1848.

Under this state of facts, can even the presumption of fraudulent intent apply, in any manner to the deed of 1848 ? and may not that deed have been perfectly legal and binding, with only a good consideration ? (Jackson v. Post, 15 Wend. Rep. 588.) We contend, that under those circumstances, fraud could not be presumed ; and that the validity of that deed could not be questioned on the ground of fraud, except by the proof of actual fraud, (on the part of the grantee as well as the grantor,) of which there is no evidence on the record in this case.

"Fraud," it is said, "will never be presumed, though it may "be proved by circumstances. Where an act does not necessarily "import fraud, where it has more likely been done through a "good than a bad motive, fraud should never be presumed." (Gregg v. Sayre, 8 Pet. Rep. 244.) To make the conveyance fraudulent and void, as to the grantee, fraud, or fraudulent intent, must be shown on her part, as well as on that of the grantor. (Waterbury v. Sturtevant, 18 Wend. Rep. 353.) Where, then, we ask, is the sign, mark, or implication of fraud ? We answer, it is nowhere to be found in the record of this case, save in the verdict of the jury, and this was based upon no evidence, but upon the erroneous charge of the judge below, *dehors the record.*

In farther support of the deed of 1848, and of the other deeds set up by the appellants, we contend that, at the time of

their execution, and since 1813, Castro was justly indebted to his wife, and had a legal right to pay off that indebtedness, before and in preference to, any other claims against him, out of any of his unincumbered property.  (Waterbury v. Sturtevant, 18 Wend. Rep. 253.)

That those deeds of conveyance were made in good faith, and for a valuable consideration, we think is fully shown by the "marriage contract" between Castro and his wife, the estimate of property thereto attached, and the recitals in the deeds, all of which were read in evidence before the jury.  At least, taken together, they were some evidence that a *consideration had moved from Castro's wife in support of those deeds,* in the absence of any testimony to the contrary.  Hence we say, the judge erred in his 10th charge, that it was contrary to law and the evidence; and taken in connection with the 9th charge, virtually instructed the jury that those deeds were made without any valuable consideration.   (Civil Code of La. Art. 2421; Lambert v. Franchebois, 16 La. Rep. 1; Adle v. Anty, 5 La. Ann. Rep. 522.)

At the time of the execution of the deeds of 1853, the judgment of 1852 was no lien upon the land thereby conveyed, or upon any of Castro's property outside of the mortgage deeds. That judgment could have been no lien upon Castro's other property, until all of the mortgaged lands had been exhausted; and at that time, no sale had been made under the judgment: Castro then had a legal right to dispose of his other property, in good faith, to pay his debts or otherwise, and we contend, that the lien of that judgment never attached to any except the mortgaged lands.   (2 Hilliard on Mort. 38, 39.)

Finally, if the court should not feel warranted, in disposing of the case upon the positions we have already taken, then we contend the judgment and decree of the court below should be reversed, and the cause remanded for a new trial, upon the following grounds:

The court erred in its 3d and 10th charges.   These, when taken together, we contend, instructed the jury that the validity

of Illies's sheriff's deeds rested entirely upon the regularity of the sales under which they were executed, independently of the judgment, decree, and executions; that they were in no manner to consider whether the judgment and decree, and the executions, or either of them, were void or not, or whether they warranted such sales. This, we think, was clearly erroneous, as it was incumbent on Illies to show a judgment and executions warranting the sales; and it was in the province of the jury, so far to consider the suit of 1848, and the judgment of 1852, as to determine whether that judgment was void or not, or whether it warranted the sales or not. (Jennings v. Stafford, 1 Ired. Rep. 404.)

The court erred in its 4th charge, because it was suggestive of a state of facts, in regard to which there was no evidence, and tended to prejudice the minds of the jury against the title of the defendants. There was no evidence showing, or tending to show, that Mrs. Castro purchased the 280 acres of land with Castro's money, and for the purpose of hindering or delaying creditors.

The court errred in its 5th and 7th charges, because they instructed the jury to find facts, in relation to which there was no evidence before them, and went to discredit the title of the defendants.

The court erred in its 9th and 10th charges, for the reasons hereinbefore stated.

The court erred in refusing each and all of the instructions asked by the defendants, to which we especially direct the attention of this court, believing that each and all of those instructions were legal, and pertinent to the matters in issue before the jury, and should have been given by the court.

*I. A.* and *G. W. Paschal,* for appellee.

WHEELER, Ch. J. The objection to the plaintiff's evidence of title, that the mortgaged lands, included in the decree of foreclosure of the 25th of June, 1852, were not exhausted by

the order of sale issued thereon, and found insufficient to satisfy the judgment, before execution was issued and levied on other lands, is not supported by the record. On the contrary, it appears that all the mortgaged lands included in the decree, and all which, by the judgment of this court, were subject to seizure and sale under the decree, were first sold. The judgment was not superseded, upon prosecuting the writ of error. It was, therefore, an authority for the issuance of execution; and it cannot affect the title of the purchaser at the sale, that property was not sold, under the decree, to which the defendant in execution had no title, and upon which the decree could not legally operate, or which was not legally subject to seizure and sale on execution under the decree. It cannot be questioned, that the judgment was an authority for the issuance of execution, or that it conferred on the officer competent authority and power to sell; and neither in the issuance of the executions, nor in the manner of executing the power conferred by them, is it perceived that there was any illegality or error, affecting the title of the purchaser, or which can be ground of objection or complaint by the appellants. (Martin v. Rice, 16 Tex. Rep. 157; Kendrick v. Rice, Id. 254; Hancock v. Metz, 15 Id. 205; Mosely v. Gainer, 10 Id. 393.)

The ground mainly relied on for a reversal of the judgment, relates to the charge of the court, and the refusal of instructions concerning the effect of the marriage contract of the 3d of November, 1813.

It may be conceded, for the purposes of this case, (and the examination of the question is therefore unnecessary,) that the interpretation of the contract, claimed for the appellants, is correct, according to the law of the place where the contract was consummated; that is, that by the celebration of the marriage, under the contract, there was a separation of property of the spouses, and that Mr. Castro became indebted to his wife in the estimated value of her property; and it may be further conceded, that the contract furnished the rule of property, personal and real, as to all after acquisitions in the country of their matrimonial domicil; and as to movable property elsewhere,

if such be deemed to have been the intention of the contracting parties. But does it govern the acquisition of real property in this State, after, by their removal here, the parties have subjected themselves, and their rights of property acquired here, to the laws of this State? Does it take such property out of the operation of the law of community of this State? Is it to be held and considered as affecting the rights of our citizens, contracting with them in reference to their property, acquired or to be acquired in this State, and without any record, or other notice of their marriage contract?

In the absence of an express contract, it is not questioned that the marital rights of persons, married in other countries, who have removed and become domiciled here, are to be governed, as to all after acquisitions of property here, by the law of this State. Such is the law, by positive enactment. (Hart. Dig. Art. 2419.) But it is insisted, that the contract in question, from its date, became the law, and furnished the rule of property of the parties to it; adhering to, and following them into any country to which they might remove; that it accompanied them in their removal to this State, and here negatives and displaces the law of the State contravening its provisions. Is it correct to suppose that this contract has possessed the invincible force, and legal ubiquity, which is ascribed to it, while the evidence of it has remained in the original archive in Paris, until it became necessary to invoke its presence here, for the purposes of this controversy?

The general rule, irrespective of the question of the effect of a change of domicil, is undoubted, that where there is an express nuptial contract, "if it speaks fully to the very point," it will generally be admitted to govern all the property of the parties, not only in the matrimonial domicil, but in every other place, under the limitations and restrictions which apply to other cases of contracts, that they are not in contravention of the laws or policy of the country where they are sought to be enforced, or with the rights of its own citizens. "It will act directly on "movable property, everywhere; but as to immovable pro-

32

"perty, in a foreign territory, it will, at most, confer only a "right of action, to be enforced according to the jurisprudence "*rei sitæ*." (Story on Conflict of Laws, §§ 143, 184; Le Breton v. Miles, 8 Paige's Ch. Rep. 261.) But "where there is a "change of domicil, the law of the actual domicil will govern as "to all future acquisitions of movable property; and as to all "immovable property, the law *rei sitæ*." (Story on Conflict of Laws, § 187.) "Where there is an express contract, that "governs as to all acquisitions and gains before removal. "Where there is no express contract, the customary law of the "matrimonial domicil governs in like manner. But in both "cases, all acquisitions and gains, made after the removal, are "governed by the law of the actual domicil." (Id. § 177; Saul v. His Creditors, 5 Mart. Rep. N. S. 569.) Such are the doctrines maintained by the Supreme Court of Louisiana, where questions of this nature, according to Judge Story, have arisen and been discussed more frequently and learnedly than in any common law country.

The learned commentator upon the Conflict of Laws, after reviewing the writings and opinions of foreign jurists upon the subject, commends the doctrines maintained by the court in Louisiana, as those which will most probably form the basis of American jurisprudence upon this subject. "They have," he adds, "much to commend them, in their intrinsic convenience "and equity; and they seem best to harmonize with the known "principles of the common law in other cases." (Story's Conflict of Laws, § 183.) The decisions of that learned court, upon this subject, are especially entitled to weight with us, for the further reason, that their former law, and their legislation upon this subject, have been the same as our own. (Hart. Dig. Art. 2419; Civil Code Revised, 2370; Saul v. His Creditors, 5 Mart. Rep. N. S. 569.)

The principles we have extracted from the text of Judge Story, and the cases from which he has deduced them, are decisive of the question we are considering, adversely to the doctrine contended for on behalf of the appellants, at least, as to

the real property here in question. The reasoning of the court in the case of Saul v. His Creditors, would go far to maintain, that where there has been a change of domicil, after the making of an express nuptial contract, the law of the after acquired domicil will govern, as to all after acquired property; unless, where the contract was made with reference to that law, or in view of a change of domicil, or such an event was in the contemplation of the parties, or the intention was in some way manifest, that the contract should govern, as to the rights of property of the parties, wherever they might reside.

The court adopt the generally received opinion among jurists, that the law of the matrimonial domicil governs the rights of married persons, where there is no express nuptial contract; because they are presumed to have had in view, and to have contracted marriage with reference to that law. But they do not consider this tacit contract a satisfactory ground for holding, with some foreign jurists, that it follows them wherever they go, especially where it is applied to property acquired after a change of domicil of the parties. The presumption, as to their agreement, cannot be extended, so as to give a greater effect to those laws than they really had. The extent of the tacit agreement depends on the extent of the law, and as that was limited by the jurisdiction of the power by which it was enacted, the tacit agreement of the parties must have a like limitation. "In a word, "the parties are presumed to have agreed that the law should "bind them, as far as that law extended, but no farther." The tacit contract is to be construed, precisely as if the laws of the place were inserted in it. If the law of community existed in the State where the marriage took place, this law regulates the property which the parties acquire in that State, but does not regulate that which they acquire in another country, to which they remove. The insertion of this law in a nuptial contract, would be nothing more than a declaration, that while residing within that State, there should be a community of acquests and gains. Such an agreement could not have the same force, as one which expressly declared there should be a

community of acquests and gains, between the parties, *wherever they went.* (Saul v. His Creditors, 5 Mart. Rep. N. S. pp. 603, 604, 605.) Such is the course of reasoning by which the court arrive at the conclusion, that the law of the matrimonial domicil does not follow the parties, and regulate their rights of property, acquired after a change of domicil.

This was not the case of an express contract. But the reasoning would seem to lead to the conclusion, that where there is one, and it does not expressly provide, or the intention be not manifest, that it is to apply to and govern all after acquired property, wherever the parties may reside, it will not be admitted to have that effect upon such property as they acquire in the country to which they subsequently remove. However that might be, as to after acquired personal property, there can be, it would seem, no doubt that such is the rule as to real property, situated in the country to which the removal takes place. The cases in Louisiana, in which this subject has been discussed, arose and were determined, upon a full examination of the whole doctrine, upon principle and authority, upon the law as it stood before the adoption of the revised Code, which contains substantially the same provision as our statute of the 20th of January, 1840. (Hart. Dig. Art. 2419; 5 Mart. Rep. N. S. pp. 573–4.) The Code is deemed indisputably to furnish the rule for all future cases in that State. (Ibid.) Hence, if the present case were before that learned court, it would doubtless be held, that the law of community existed between the parties to this contract, in respect to the property here in question.

It is to be observed, that in this contract, there is no stipulation that its provisions shall govern as to property thereafter acquired, in whatever country the parties may reside. There is no reference to property to be acquired in any other country, nor to the laws of any other country than that in which the marriage was contracted. But there is an express reference to the law of that country, and a declaration of intention to be governed by its provisions, with certain modifications therein expressed. The inference would seem to be, that the parties

did not contemplate a change of domicil, and did not contract with reference to their after acquisitions, in case of removal to another country. They, it would seem, did not intend to provide a rule of property for their government, after such removal. They do not appear to have had in contemplation that state of the case, or to have intended to provide for it. Their contract does not speak to that point; but it does expressly adopt, with certain modifications, the law of the country of their residence; and the case does not seem materially to differ from the case supposed, of an incorporation into a nuptial contract, of the law of the place where it was made. So considered, it would govern their after acquired property there, but would have no influence, it is supposed, beyond the jurisdictional limits of the laws of that country.

The case of Le Breton v. Miles, 8 Paige's Ch. Rep. 261, cited by counsel for the appellants, is not opposed to this view of the law. There the contract was made between natives of France, residing at the time in New York, but with express reference to the law of France, and to an intended residence there. The laws of France, in force at the time of the consummation of the marriage, therefore, very properly applied to and governed their rights of property under the contract.

The case of Decouche v. Savetier, 3 Johns. Ch. Rep. 190, also cited by counsel for the appellants, does not in the least militate against the view taken by the court in Louisiana. That was upon an express nuptial contract, which contained the following provision : " That there shall be a community of pro-" perty between them," (the parties to the contract,) "accord-" ing to the custom of Paris, which is to govern the disposition " of the property, *though the parties should hereafter settle in* " *countries where the laws and usages are different or contrary.*" And the wife, in that case, did not accompany her husband, who abandoned her, and came to reside in New York, where he acquired a personal estate, which was disposed of by the court, according to the law and express terms of the contract. Here, as we have seen, the contract contains no similar stipulation or

provision, and the property in question is not personalty, but realty, in respect to which the law *rei sitæ,* is held to govern.

It would be extremely difficult, we apprehend, upon the ground of this contract, to deny to Mrs. Castro her community rights and interest in the property acquired by her husband, since their removal to this State. Her claims, it is believed, could not be successfully resisted, upon any recognized principle in the law of this country, which may be invoked to determine the marital rights of persons, who have subjected themselves, and their rights, in the acquisition of property, to the influence of our laws. But whatever may be the rights of the parties to the contract, as between themselves and their representatives in the succession to their property, we think it clear, that the contract in question cannot have the effect to govern their rights in their real property, acquired and situate here, to the prejudice of the rights of other citizens, who have contracted, on the faith of the property, and without notice of a contract giving it a different *status* from that of other parties, or establishing a rule for its government, variant from the law of the land. If the contract be the law for the parties to it, in this State, it is not the law for other citizens of the State; and, until notice, cannot be invoked to the prejudice of their rights. (Hart. Dig. Art. 2414; Hall v. Harris, 11 Tex. Rep. 300 ; Young v. Templeton, 4 La. Ann. Rep. 254.) We conclude, therefore, that the legal presumption applies with its full force, that the property was community property, acquired with the funds of the community ; and that the conveyance to Mrs. Castro, or to her use, carried with it this legal presumption, which it devolved on her to repel, by clear and satisfactory proof, that it was purchased with her own individual money or means.

But it is not perceived that the case would be materially different, whether the law of the State, or the contract, be deemed to govern the rights of property of the parties. If the latter, it is conceded, that the doctrine of tacit mortgage cannot be invoked to aid the claims of the appellants. (Hall v. Harris, 11 Tex. Rep. 300.) And if the parties are to be deemed to be

separate in their property, "as if they were simply two friends inhabiting the same house," still the conveyance, by one to the other, would be liable to be impeached for fraud. And if the contract, *per se*, afforded evidence of a valuable consideration passing from Mrs. Castro for the conveyance of the property, as the court instructed the jury that it would, and the conveyances were binding, as between the parties to them, still, if made in fraud of the rights of creditors of the party making them, they might be avoided as to them. It is not enough, that a conveyance be upon good consideration; it must be *bonâ fide*, also; and not made to hinder, delay, or defraud creditors. Whether the conveyances were so made and intended, was the material issue submitted for the decision of the jury. It was fairly left to their decision, by the charge of the court. And in view of all the circumstances surrounding the transactions; the embarrassed circumstances of Mr. Castro, commencing, it seems, as early as 1847; his heavy indebtedness to the appellee; his property consisting principally in lands, which, from the evidence, it would be reasonable to conclude, were not easily available to pay a debt of twenty thousand dollars, which, it seems, the appellee was seeking to enforce or secure before the date of the first conveyance, and about which litigation had already commenced; in view of all the facts disclosed by the evidence, and the nature and surrounding circumstances of the transactions, we cannot say the evidence was not sufficient to warrant the verdict.

In reference to the objection, that there is no evidence of a knowledge of the imputed intent, on the part of the beneficiaries, it will suffice to say that, from the relations of the parties, it is scarcely to be supposed that the circumstances and intentions of the grantor were not known to the beneficiary. The court did not err in refusing to give the instructions asked, respecting the consideration of the conveyances, in the terms in which they were propounded. The instruction given was sufficient upon that subject. Nor was there error in refusing the eighth and final instruction asked. The contract had been ad-

mitted in evidence, and was before the jury for their consideration; and the court might very properly decline to call their especial attention to a particular part of the evidence, by instructions as to the weight to which it was entitled, or the purposes for which it might be considered by them. It was in evidence before them, for their consideration, in connection with the other evidence in the case, and that was sufficient.

We are of opinion that there is no error in the judgment, and it is affirmed.

Judgment affirmed.