MARIA SOPHIA KLEB

*v.*

JEAN KLEB et al.

[Decided November 23d, 1905.]

An antenuptial contract was made in Hanau, Germany, in the year 1861. It was stipulated as follows: "We voluntarily have engaged ourselves to be married; we are not related and hereby wish ["wollen"], in case of the death without issue, to make a marriage contract to the effect that the surviving spouse shall be the sole heir of the predeceased spouse." The parties to this agreement were at the time domiciled in the then electorate of Hesse Cassel, and did not possess any property. Several years after their marriage they came to New Jersey, and there acquired real estate, title to which was taken in the name of the husband. The husband subsequently died in Germany. In a suit by the wife against her husband's heirs, based upon the above agreement, it was—*Held,* that the New Jersey land was within the scope of the contract. *Semble,* that in a suit against the heirs for the specific performance of the ancestor's contract, the contractee-complainant cannot testify as to transactions with or statements by the ancestor.

On bill for specific performance of an antenuptial agreement.

*Mr. Ernest F. Keer* and *Mr. Robert H. McCarter,* attorney-general, for the complainant.

*Mr. John W. Queen,* for the defendants.

STEVENS, V. C.

This is a bill to compel the performance of an antenuptial agreement, made between the complainant and her late husband, Peter Kleb. The defendants are his heirs-at-law.

The agreement was made at Hanau, in the year 1861, in the then electorate of Hesse Cassel. The original, signed by the parties and their parents, is contained in a court record of the town, and is translated as follows:

"Marriage Record, 1861, page 532. Hanau, this 29th day of April, 1861. In the presence of Assessor of the Court (acting judge) Schmedes. Clerk of the Court Michael. There appeared as the persons engaged to be married—first, former Peter Kleb, of Hanau, born on the 10th day of June, 1836, the legitimate son of Johannes Kleb, a driver, and of his wife, Elizabeth, *nee* Breitenberger, of this place. Second, Marie Sophia Marx, of Hanau, born on the 17th day of November, 1838, as the legitimate daughter of George Friedrich Marx, master butcher, and of his wife, Susanne Franziska, *nee* Kunz, of this place, who stated: We voluntarily have engaged ourselves to be married; we are not related, and hereby wish ["wollen," a word importing obligation], in case of the death without issue, to make a marriage contract to the effect that the surviving spouse shall be the sole heir of the predeceased spouse. The parents of the two engaged persons declared their consent thereto. The parties engaged thereupon submitted the following documents: *First,* their respective certificates of birth; *second,* certificates of the chief mayor of this place regarding the reception of the bridegroom to citizenship here, as well as in regard to his ability to make a living; *third,* certificate that notice had been given to the commander of the regiment; *fourth,* receipt for the citizen's money; *fifth,* receipt for the marriage tax, and, finally, the parents of the persons engaged declared that they are willing to waive, in reference to this marriage contract, their rights to their obligatory shares. Read and approved. Signed W. P. Kleb, Sophie Marx, Fr. Marx, Johannes Kleb, S. Marx, Elizabeth Kleb. For certification of signatures. Signed: Michael."

At the time this agreement was made the parties had no property. The husband's trade was that of a brass founder. They resided at Hanau, and continued to reside there for four years. Then they went to Switzerland, where they lived four years

more, and then they came to the United States. After living in New York for a year they came to Newark, where they had a restaurant and saloon. They labored together in the business and were so successful that in August, 1882, Peter Kleb purchased the premises known as 842 Broad street for $30,000, paying $9,000 or $10,000 in cash. They continued in this business, which was conducted in Peter's name, until 1886, by which time they had paid off the $20,000 mortgage which secured a part of the purchase-money. Then they rented the property, which rapidly increased in value, and went back to Germany, where they continued to reside until September, 1901, when Peter Kleb died. Mrs. Kleb received the rents after his death until, desiring to sell, she discovered that the deed was in Peter's name and that on the record she had no title except to dower. It may be proper to add that the bill alleges that a will was made and proved in Germany, but the evidence, or perhaps I ought to say the colloquy between counsel, shows that it was not executed in such manner as to transfer title to real estate here.

The question argued was whether the antenuptial agreement made in Hanau operates upon real estate subsequently acquired in New Jersey.

Story, in his work on *Conflict of Laws,* § *184,* in a passage that has been frequently cited with approval, thus formulates the rule:

"1. Where there is a marriage between parties in a foreign country and an express contract respecting their rights and property, present and future, that, as a matter of contract, will be held equally valid everywhere, unless, under the circumstances, it stands prohibited by the laws of the country where it is sought to be enforced. It will act directly on movable property everywhere. But as to immovable property in a foreign territory, it will at most confer only a right of action, to be enforced according to the jurisprudence *rei sitæ.*

"2. Where such an express contract applies in terms or intent only to present property, and there is a change of domicile, the law of the actual domicile will govern the rights of the parties as to all future acquisitions."

In *1 Whart. Confl. L. (3d ed.)* § *199a,* the editor thus states the law as he gathers it from decisions made mostly since the above passage from Story was written:

"The statement in the last section that a change of domicile does not work any change of law governing the construction of the contract is undoubtedly true with respect to property, wheresoever situate, which is within the scope of the contract. It is often a question, however, what property is within the scope of the contract. *That question is, in its last analysis, one as to the intention of the parties.* When the contract expressly, or by clear implication, covers future acquisitions after a change of domicile, its construction and effect with reference to such property, as well as property acquired before the change of domicile, are undoubtedly to be governed by the law of the original matrimonial domicile; but when the contract applies in terms or intent only to present property, or is to be performed only in the country where made, and there is a change of domicile, the law of the actual domicile will govern the rights of the parties as to all future acquisitions, for upon this assumption the contract is eliminated, so far as such property is concerned."

Counsel for the defendants, in support of their contention that the contract in question is to be construed as applying only to property that the spouses might have acquired in Germany, refer to the following cases: *Fuss* v. *Fuss, 24 Wis. 256; Castro* v. *Illies, 22 Tex. 479; Besse* v. *Pellochoux, 73 Ill. 285; Long* v. *Hess, 154 Ill. 482.* In each of these cases it was held that a marriage contract executed abroad by spouses domiciled there did not apply to or bind lands acquired subsequently, situate within their new domicile. In the Wisconsin and Illinois cases it was held that the language of the contract indicated an intention to localize it. The Texas case was put on other grounds. I have not been referred to any case, and I have found none, which decides that where there is nothing in the contract evincive of an intention to give a restricted operation to it; where it relates only to after-acquired property, and where its terms are sufficiently comprehensive to include all such property, the mere failure to declare, in so many words, that it is to operate on property without the matrimonial domicile will prevent it from so operating. In *Besse* v. *Pollochoux,* the antenuptial agreement had been made in Switzerland, the matrimonial domicile of the spouses. It provided, among other things, as follows:

"1. The future husband associates and renders his future wife partaker of half the property acquired during their marriage."

"3. Joseph Nicholas Besse, as well for his wife as himself, both present and natives of Orsieres, where they now live, desiring to prove to the

young couple their approval of the union to be contracted, give to their son, Joseph Nicholas, half of their immovable as well as their movable property, on the close conditions that the conjoints will work the other half still retained and belonging to said parents."

They subsequently emigrated to Illinois. The husband there purchased real estate; the wife died and the heirs of the wife claimed title to one-half of it. Justice Scott, after adverting to the fact that the word "partaker" was one of doubtful significa- . tion; that no words were used which, in their ordinary or legal import, defined what estate the wife took, and that none were used that conveyed the idea that the estate should descend to her heirs, goes on to say: "The contract associating the parties thereto as joint partakers in the property to be acquired by the marriage does not specify any place where it is to be performed. But we are not left in doubt on this point. An examination of its provisions shows that it could not be performed at any place other than the place where it was entered into, viz., the place of the matrimonial domicile."

*Long* v. *Hess, 154 Ill. 482; 40 N. E. Rep. 335,* is to the same effect. The marriage agreement, made in the grand duchy of Hesse, provided, among other things, that the bride agreed "to receive the groom to live at her house;" that the groom brought into the marriage a piece of land situated at Unter Beerfelden, and that the contracting parties subjected themselves to the general laws of Germany, especially the rules and customs of the country. Justice Bailey said that the evidence furnished by the contract was "all in the direction of showing that their intention was to make Beerfelden their permanent home," and that there was a total absence of express provision in the contract making it applicable to the future acquisitions of the parties, the case in that respect being, as he said, distinguishable from *Scheferling* v. *Huffman, 4 Ohio St. 241,* where "the contract by its express terms was made applicable not only to the property then owned by the intended wife, but also to all property acquired during the continuance of the marriage." The express terms thus referred to were contained in the following clause: "If I should die first, my affianced, Ernestine, shall inherit all my property,"

a clause which does not differ materially from that under consideration.

It is evident that these two cases furnish no support to the defendants' contention. *Castro* v. *Illies, 22 Tex. 479,* is another of the cases upon which complainants rely. There a judgment creditor sought to avoid, as fraudulent, a conveyance by a husband to his wife. It was attempted to support it by reference to the provisions of a marriage contract entered into in France by persons then subjects of that country. The agreement provided that there should be no community of property between husband and wife; that they should hold their respective properties separately, and that they intended to submit themselves to certain provisions of the Code Napoleon. The consideration for the conveyance alleged to be fraudulent was a debt due from husband to wife, said to have arisen many years before, under the provisions of this agreement. The decision was that the verdict of a jury condemning the conveyance as fraudulent should stand. As I understand the case, the decision was put ultimately upon the ground (1) that the contract would not bind creditors who had no notice of it, and (2) that the conveyance was fraudulent in fact. Under the provision of the marriage contract that the spouses should hold their property separately, I do not see how the wife could have claimed that, either in France or in Texas (if it operated on property in Texas), the marriage contract vested her with a title, legal or equitable, to her husband's lands. If she took at all, it was under her husband's conveyance, and this the jury found to be fraudulent. The case appears to have little or no relevancy to the question I am considering, although there are in the opinion *dicta* respecting it whose bearing upon the facts of that case are not quite obvious. None of them, however, go the length contended for.

The only case which appears to give any countenance to defendants' position is *Fuss* v. *Fuss, 24 Wis. 256.* The agreement was made at Cologne. It provided, so defendants say in their brief (though the case as reported does not give the clause *verbatim*), that "the aforesaid John William Fuss hereby grants and transfers, as a full irrevocable property, by a lawful war-

ranty, and in the form of a donation among the living, to his wife, Anna M. Eichen, all and every personal and real property which shall belong to him, the donator, on the day of his death." This was a post-nuptial and not an antenuptial contract. The wife had real property in Prussia at the time it was made. This was sold and the spouses emigrated to Wisconsin. Some of the money arising from the sale was invested in real estate in Wisconsin in the name of the husband. The husband died and the wife claimed it. Justice Dixon said: "There is nothing in the contract which speaks fully to the very point; nothing which manifests any intention of the parties to regulate or control by it, and according to the laws of their matrimonial domicile, their future acquisitions and gains of property in any foreign state or territory, or any property which should be held or owned by them in such state or territory. The contract was obviously made with reference to its operation and effect within the kingdom of Prussia upon the property of the parties situate there, and with no reference to property situate elsewhere. It appears that they had no property elsewhere, and there is no ground for supposing that they, at that time, contemplated any change of domicile, or a removal to this country or any other." Had the opinion stopped here it would have seemed that there were, in the estimation of the learned judge, two circumstances which tended to show that the intention was to make the contract operative only upon lands in Prussia. These were (1) the fact that the wife had real property in Prussia which it was the design of the agreement to protect, and (2) the form of the transfer, viz., "donation among the living," an instrument unknown, both in its form and incidents, to the common law. But he adds these words: "The contract, to have operated upon the rights of the parties abroad, must have been made with express reference to such operation." If by this was meant that it must have been stated in the contract, in so many words, that it was intended to operate upon property *without* the domicile, then the statement is without support in any book referred to in the opinion. Story is the authority principally relied on, and Story says (at § *185*) that where the express contract "applies in

terms or *intent,* only to present property, and there is a change
of domicile, the law of the actual domicile will govern the rights
of the parties as to all future acquisitions." This is a very dif-
ferent proposition from that contained in the sentence last
quoted.

The *Fuss Case* and the three other cases above mentioned
differ from the case in hand in two important particulars bear-
ing upon the question of intent. *First.* In each of those cases
the spouses, at the time of the making of the contract, possessed
property. *Second.* The phraseology of the contracts was such
as to indicate that all' the property to which their provisions
were designed to apply was to continue subject to the law of the
matrimonial domicile. Property without the domicile was, by
implication, excluded from their operation. To use the words
of Judge Story, it appeared affirmatively that the contract ap-
plied in terms or intent to present property or the property to
be acquired within the then domicile. In the case in hand,
neither of these *indicia* of intention appears. Mr. and Mrs.
Kleb had no property when they made the agreement. They
must, therefore, have intended it to operate upon after-acquired
property. But the terms used in reference to their future acqui-
sitions are of universal application. They contain within them-
selves no implication that they were to be limited to Hesse
Cassel. Instead of such expressions as "partaker of half of the
property," "donation among the living," we find "death without
issue," "marriage contract," "the surviving spouse shall be the
sole heir of the predeceased spouse." Now, "death without
issue" and "sole heir" are as familiar to the common as to the
civil law. Their meaning is definite and well understood, and
they are used in all their generality. It is conceded that the
question is one of intent. This is not an artificial intent im-
puted without reference to the real wishes of the parties, but an
intent such as we may reasonably attribute to them in the situa-
tion in which we actually find them.

In the construction of contracts it is proper to consider sur-
rounding circumstances. In this connection there are two con-
siderations not yet adverted to which seem to be of some weight.

Spouses possessed of landed property are not as likely to think of bettering their condition by emigration as those who are possessed of none. At the period in question (1861) emigration from Germany to this country was, and for several years previously had been, taking place on a large scale. It is not unreasonable to suppose that an intelligent couple like Mr. and Mrs. Kleb might have regarded emigration as among the possibilities of their married life. But there is another and, as it seems to me, a stronger circumstance. In 1861 the town of Hanau lay in the electorate of Hesse Cassel, an independent principality. It was no part of the German empire, for the German empire did not then exist. It was an independent state, like Prussia or Saxony. Having, however, sided with Austria against Prussia in the war of 1866, it was, as one of the results of that struggle, incorporated into the latter state. Hanau, as may be seen by reference to any map published prior to 1866, lay in what may be described as a narrow neck of territory scarcely ten miles wide, from which one might see, to the southeast, the territory of Bavaria and, to the north, the duchy of Hesse Darmstadt. Such being the situation, is it reasonable to impute an intention to confine the marriage contract to such property as the spouses might acquire in Hesse Cassel and to exclude from its operation land, the subject of possible acquisition, in Bavaria and Darmstadt? If it was the intention that the agreement should operate beyond Hesse Cassel, I do not know on what theory we could say that it would operate in some foreign states and would not operate in others.

The question, then, being one of intention—intention to be deduced from the language of the contract and the surrounding circumstances—it seems to me more reasonable to credit Peter Kleb with an intention to constitute his betrothed, in default of issue, the heir of all his real estate, than the heir of such real estate only as he might thereafter have acquired in the narrow territories of Hesse Cassel. If I devise my realty to A, this means not only my realty in New Jersey, but my realty elsewhere. If for valuable consideration I covenant that I will devise my property to A, I presume that, in the absence of

restrictive words in other parts of the instrument, no one would contend that the covenant did not extend to lands in New York or California—independent sovereignties, so far as this question is concerned. If by an antenuptial agreement I agree to make my wife, in default of issue, heir or devisee of my future-acquired estate, I am quite unable to understand why she should not take such real estate as I may be seized of at my death, not only in New Jersey, but elsewhere. It seems to me that such an agreement does speak to the very point. The cases uniformly hold that where, by the antenuptial agreement, it is shown to be the intention of the parties that its provisions shall apply to property without the matrimonial domicile, effect will be given to it everywhere unless its execution be incompatible with the laws or public policy of the country in which its enforcement is sought. *Decouche* v. *Savetier, 3 Johns. Ch. 190; Le Breton* v. *Miles, 8 Paige Ch. 261; Crosby* v. *Berger, 3 Edw. Ch. 538; Murphy's Heirs* v. *Murphy, 5 Mart. (La.) O. S. 83; Scheferling* v. *Huffman, 4 Ohio St. 242.*

But it is argued that the contract must be regarded as local because of the provision that "the parents of the persons engaged declare that they are willing to waive, in reference to this marriage contract, their rights to their obligatory shares." The argument is that this stipulation was local, and that consequently the entire contract must be deemed local. But, in the first place, there is no proof that it was local. The right to such shares may have been, and was, no doubt, accorded by other states comprised within what was then geographically designated Germany. It existed under the Roman law, and was given by the *Code Napoleon,* section 915 of which reads as follows:

"Les Libéralties par acte entre-vifs, ou par testament ne pourront excéder la moitie des biens, si à défaut d'enfant, le defunt laisse un ou plusieurs ascendants dans chacune des lignes paternelles ou maternelles; et les trois quarts, s'il ne laisse d'ascendants que dans une ligne."

Aside from this, the agreement is the independent agreement of the parents. They stipulate that whatever right they may have to their obligatory shares they are willing to waive. This

is by no means equivalent to a declaration that their right to obligatory shares will extend to *all* the property that their children may acquire, so far as it may be subject to the antenuptial contract. That would be a strange construction that would restrict a general grant to the limits of the actual operation of a release by third persons. The release means simply this: Whatever right, if any, we may acquire in our children's property, that we are willing to waive.

I am of opinion, therefore, that the antenuptial agreement extended to the property in question. It plainly appears that the subsequent acquisitions of the spouses were quite as much the result of Mrs. Kleb's labors as of her husband's, and Frederick Struberg testifies that often, in conversation after Kleb's return to Germany, he (Kleb) would refer to the antenuptial agreement as giving to the longest liver "the benefit of all we are worth." This evidence cannot influence its construction, but it shows at least that the result reached is not in conflict with the opinion of Mr. Kleb, as expressed in the latter years of his life.

There were other questions raised, but in the view that I have taken of the case only one need be adverted to. That is the question of the admissibility of Mrs. Kleb's testimony of transactions with and statements by her husband. It was admitted under objection. The situation is this: Mrs. Kleb sues the heirs-at-law of her husband to enforce his contract in respect of lands descended. Are they being sued in a representative capacity? The question has been twice before the court of errors and appeals, and it has declined to pass upon it. *Wyckoff* v. *Norton, 60 N. J. Eq. (15 Dick.) 474; Kempton* v. *Bartine, 60 N. J. Eq. (15 Dick.) 411.* In this court Vice-Chancellor Van Fleet, *Crimmins* v. *Crimmins, 43 N. J. Eq. (16 Stew.) 86;* Chancellor McGill, *Vreeland* v. *Vreeland, 53 N. J. Eq. (8 Dick.) 390,* and Vice-Chancellor Emery, *McKinley* v. *Coe, 66 N. J. Eq. (21 Dick.) 70,* have thought the evidence admissible, while Chancellor Runyon, *Colfax* v. *Colfax, 32 N. J. Eq. (5 Stew.) 206;* Vice-Chancellor Pitney, *Greenwood* v. *Henry, 52 N. J. Eq. (7 Dick.) 447,* and Vice-Chancellor Grey, *Kempton* v. *Bartine,*

*59 N. J. Eq. (14 Dick.) 149, 158,* have deemed it inadmissible. In this conflict of authority any expression of opinion on my part can have but little weight. It has seemed to me, however, that the reasons for its exclusion are stronger than those for its admission. Vice-Chancellor Van Fleet's decision seems to rest upon an erroneous conception of what was decided by Chief-Justice Beasley in *Hodge* v. *Coriell, 44 N. J. Law (15 Vr.) 456.* That this latter case was correctly decided no one can have any doubt. It was a replevin suit, and the wrongful act alleged was that of the defendant, not that of the defendant's intestate. Chief-Justice Beasley said: "The defendant in this writ is called to account for a tort in his own person. With regard to any estate represented by him, the plaintiff has no concern. The defendant could not be sued in this matter in his representative capacity." How, from a decision put upon this ground—viz., that the defendant was being sued for a tort of his own, not for the wrongful act of his testator—it could be legitimately inferred that the heir-at-law is not being sued in a representative capacity, when the suit is based upon the act or contract of the ancestor, I am at a loss to understand. The inference appears to me to be an entire *non sequitur.* Chancellor McGill simply followed Vice-Chancellor Van Fleet without giving the matter, as far as appears, independent consideration, and Vice-Chancellor Emery thought himself bound by their opinion. On the other hand, it seems to me that the principle upon which *Joss* v. *Mohn, 55 N. J. Law (26 Vr.) 407,* was decided leads to the opposite conclusion. There the action was brought by plaintiff against the devisees of Mohn to recover money lent to testator in her lifetime. Mr. Justice Reed said: "The primary question is, Are heirs and devisees in actions under the statute representatives of the deceased debtor? I think they are. Mr. Bouvier, in his *Law Dictionary, lit. 'Representative,'* uses this language: 'The heir represents the ancestor; the devisee, his testator; the administrator, his intestate.' It seems entirely undeniable that, in actions like the present, the heir or devisee stands in stead of and so represents the deceased debtor. * * * The object of the statute is to subject the real estate of the deceased debtor to a liability

for all classes of debts left unpaid by such debtor." It was held, in *New Jersey Insurance Co.* v. *Meeker, 37 N. J. Law (8 Vr.) 282,* that an action of covenant would lie, under the Heirs act, against heirs and devisees for a breach of covenant against encumbrances contained in a conveyance by an ancestor; that that act was "applicable to every obligation growing out of contract." Consequently, if an ancestor has made an agreement to convey real estate, an action to recover damages will lie for breach of it, and under *Joss* v. *Mohn* the heir in such action will be sued in a representative capacity. Now, if in a suit at law the heir is sued in a representative capacity, it would at least be singular if it were held that, in a suit in equity between the same parties to compel a specific performance of the same contract, the defendant was being sued in a non-representative character. Are not the obligation and the person the same? Have we not the same ground of liability, viz., the immediate devolution upon the heir of property bound in one form or another to answer for the ancestor's obligation? The court in which relief may be sought and the particular species of relief asked for seem to be irrelevant considerations. That the court may look at the real character of the parties to the controversy is conclusively settled by *Smith* v. *Burnet, 35 N. J. Eq. (8 Stew.) 314,* and *Adoue* v. *Spencer, 62 N. J. Eq. (17 Dick.) 794. Hodge* v. *Coriell* did not decide otherwise. All that it decided was that when a defendant was sued for his own tort, he could not, by pleading, change the issue to one involving the acts of his intestate. *Smith* v. *Smith, 52 N. J. Law (23 Vr.) 207,* rests upon much the same ground as *Haines* v. *Watts, 55 N. J. Law (26 Vr.) 149,* and does not touch the question under consideration, and *Palmateer* v. *Tilton, 39 N. J. Eq. (12 Stew.) 40,* and *Rairdon* v. *Sampson, 67 N. J. Law (38 Vr.) 346,* merely decide that the record determines the question of competency; that if the person offered as a witness is not a party to the record, he is competent, no matter what his interest may be. The court of errors and appeals has never decided, nor, as far as I can find, so much as intimated, that if a person called as a witness appears by the allegations of the pleadings to be really sued in a repre-

sentative capacity, the court may not exclude him, because the pleader has not, in so many words, called him administrator or heir or devisee, and has not expressly alleged that he proceeds against him in that character. In *Smith* v. *Burnet* it decided just the reverse. If the pleadings or record state facts which show that he is suing or being sued in a representative character, then he is disqualified.

For these reasons, and for those stated by Vice-Chancellor Grey, in *Kempton* v. *Bartine, supra,* I should be disposed to exclude the greater part of Mrs. Kleb's testimony. But there is one part of it which seems to be competent. It appears that since her husband's death, Mrs. Kleb went to the record in Hanau and there compared a copy of the antenuptial agreement with the original. She says she knows her husband's handwriting, and that the signature "W. P. Kleb" is his. This, I think, she may testify to. It is not evidence of a transaction with or statement by the deceased. In the absence of evidence to the contrary, it may reasonably be presumed that her knowledge of his handwriting was at least partly acquired in other ways than by transactions with him.

I think Mrs. Kleb is entitled to a conveyance from the heirs of the legal title to the Broad street property.