L. C. MITCHELL, PETITIONER, _v._ COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 41610. Promulgated July 27, 1933.

*Joseph Nievinski, Esq.*, for the petitioner.
*George S. Adams, Esq.*, for the respondent.

OPINION.

MARQUETTE: Shortly after their marriage and on the eve of acquiring the bakery business in McMinnville, Oregon, the petitioner and his wife entered into the contract of June 25, 1909. Respondent contends that this contract related only to the capital invested in and the income derived from this particular business. The petitioner asserts that this contract was in the nature of a marriage settlement which fixed the proportions in which the petitioner and his wife were to own all property acquired by either during the marriage.

The contract contains no provisions which in terms show that it applied only to the baking business. On the other hand it speaks of "all" mutual property and income—a very general term. In this state of case the mutual understanding of the parties should be given consideration. Both testify that it was their understanding that it was to continue in effect so long as they were married. This contemporaneous construction by the parties interested in our opinion resolves the doubt in favor of their construction.

When we come to the question of what property was embraced by the contract we find that the words "property" and "income" are modified by the adjective "mutual." This adjective is used twice and evidently for a definite purpose and that purpose was, we think, one of restriction. Not all property and all income were to be owned by the husband and wife in the proportions stated but only such property as was mutual. The primary meaning of this word is reciprocal. It also imports the idea of common or joint, Webster's New International Dictionary. *Robison* v. *Wolf*, 27 Ind. App. 683; 62 N.E. 74; *Modern Order of Praetorians* v. *Bloom* (Okla.), 171 Pac. 917. Here the parties were about to invest their capital and contribute their labor to a common or joint enterprise. The capital of each was to be jointly used and the income which was to be shared was that derived from the joint use of their capital and the common contribution of their labors. Giving to the word "mutual" the only meaning which is applicable to the situation and construing it in the light of the enterprise about to be begun, it seems clear that the word as used imports the idea of common or joint. Thus, it certainly could not be successfully contended that property acquired by either from sources that were not mutual was to be owned by both, as, for instance, property acquired by devise or bequest. By the same token we think that this word does not cover the earnings of either which were not derived from a mutual source.

This contract was valid in Oregon (Oregon Laws, secs. 9743, 9744, 9745; *Grubbe* v. *Grubbe*, 26 Ore. 363; 38 Pac. 182) and being intended to cover after-acquired property to the extent we have

indicated, it was valid in California and Utah. *Kleb* v. *Kleb*, 70 N.J.Eq. 305; 62 Atl. 396, and authorities cited.

Under this construction all the income derived from the school in Portland and the laboratory in Los Angeles was mutual. On the other hand, the petitioner's earnings from his employment in the mill in Oregon became his separate property and his earnings from his position in Los Angeles were community income, which under the laws of California were his income. *Pedder* v. *Commissioner*, 60 Fed. 866. But when the petitioner deposited his earnings in the joint bank account in Oregon they at once became mutual and were owned in the proportions fixed by the contract of 1909. The same is true of the deposits made in the bank in California. *Pedder* v. *Commissioner, supra*, and cases cited. By virtue of the agreement of 1909 the interest of each in the joint deposit was in the ratio of three to four.

The purchase in 1919 of 5,500 shares of the stock of the Oregon Baking Co. was made with money drawn from the joint bank account in which Mrs. Mitchell had an undivided four-sevenths interest, with the result that she became the equitable owner of four sevenths of the stock then purchased. *John H. Flach*, 13 B.T.A. 383; *Carrie E. Molter*, 19 B.T.A. 911; affd., 60 Fed. 498; *Paul F. Hill et al., Executors*, 24 B.T.A. 1144. The petitioner owned the other three sevenths.

In 1920 the petitioner purchased 29,000 shares from Wright and 5,500 shares from Wishart. On this purchase a down payment amounting to $4,000 was made in Liberty bonds which had been purchased with money drawn from the joint bank account. Although it is not clear whether an indefinite number of these bonds belonged to Mrs. Mitchell, it would seem that the only effect of such a transaction would be to increase her share. Not being informed as to the amount, if any, of the bonds which she may have separately owned, we find that she was the equitable owner of the stock then purchased to the extent of her four-sevenths interest in the bonds used in the acquisition of this stock. For the remainder of the purchase price the petitioner executed his personal notes which according to the understanding between him and Wright, were to be paid out of his salary and from the dividends. This agreement was carried out. None of this money came from a mutual source but all from the earnings and property of the petitioner. The stock so purchased, except to the extent of Mrs. Mitchell's interest in the Liberty bonds, was the petitioner's stock.

What we have said with reference to this stock applied equally to that purchased in 1924 and 1925 in order to effect the sale to the Continental Baking Corporation. All of this stock belonged to petitioner.

As against this conclusion the petitioner makes two contentions. The first is that when he purchased the stock from Wright it was his desire that four sevenths of it be placed in the name of his wife, a request with which Wright refused to comply. We attach little importance to this for two reasons. First, the petitioner agreed to it and, second, if he was in fact in earnest about this being done, he could easily have placed four sevenths of the 5,500 shares purchased in 1919 in his wife's name. Wright could not have objected to this since that stock was paid for in cash and Wright or whoever owned it would not have been compelled to sue Mrs. Mitchell. Besides, 250 shares of this stock were placed in her name in order that she might qualify as a director. The second contention of petitioner is that the division in 1925 of the proceeds of the sale was made in accordance with the contract of 1909. We are unable to find that any such division was made. The testimony on this question is quite hazy. We do not know what became of the $100,000 fund that was set aside. We do not know how or in whose name it was invested. We are informed that $30,000 was turned over to Mrs. Mitchell, but this amount was to be and was placed in trust for the education of their daughter, a duty which rested just as much on him as on her. The petitioner retained between $31,000 and $33,000. It is true that Mrs. Mitchell received between $7,000 and $8,000, but this came not from the proceeds of the sale of the stock but from a sale of land which stood in the petitioner's name. The record does not disclose that Mrs. Mitchell then or thereafter received four sevenths of the proceeds of the sale.

The respondent's determination is sustained except to the extent of the gain arising from the sale of Mrs. Mitchell's equitable interest in the stock of the Ogden Baking Co. by reason of the investment therein of her four-sevenths interest in the joint bank account and in the Liberty bonds.

*Judgment will be entered under Rule 50.*