**HOEFER, Ex'r, et al. v. PROBASCO, Adm'r.**

No. 11298—Opinion Filed March 1, 1921.

(Syllabus by the Court.)

**1. Husband and Wife — Antenuptial Contracts—Construction.**

One of the cardinal rules applicable in the construction of antenuptial contracts is to disregard the form of the contract, if the intention of the parties in making the agreement can be ascertained, and give force and effect to the intent of the parties.

**2. Same—Effect of Change of Domicile—Law Governing—After-Acquired Realty.**

Where there has been a change of domicile after making of an express nuptial contract, the law of the after-acquired domicile will govern as to all after-acquired real property; unless where the contract was made with reference to that law, or in view of a change of domicile, and it was the intention of the parties that the contract should govern wherever they should reside.

**3. Same—Sufficiency of Evidence.**

From an examination of the record, held: The evidence is sufficient to support the finding of the trial court that an antenuptial contract was entered into between Mrs. Strom and Mr. Strom, but there is no inference to be drawn from the contract, nor from the evidence, that at the time of entering into the contract the parties were contemplating a change of residence to Oklahoma, nor is there any evidence, or inference to be drawn therefrom, that it was the intent of the parties that the contract should apply to land thereafter homesteaded by Mr. Strom in Oklahoma.

Error from District Court, Kay County; J. W. Bird, Judge.

Action by G. M. Probasco, administrator of the estate of Susan S. Strom, deceased, against John E. Hoefer, executor of the will of Joseph Strom and the heirs of Joseph Strom, to enforce an antenuptial contract and declare a resulting trust. Judgment for plaintiff, and defendants bring error. Reversed.

William S. Cline, for plaintiffs in error.

G. A. Chappell, for defendant in error.

McNEILL, J. This action was commenced in the district court of Kay county by George M. Probasco, administrator of the estate of Susan S. Strom against Joseph Strom to enforce an antenuptial contract entered into by Susan S. Strom and Joseph Strom, and to declare a resulting trust. Joseph Strom is now deceased, and the case is prosecuted in the name of John E. Hoefer, executor.

The material facts as disclosed by the evidence may be stated as follows: Joseph Strom and Susan S. Probasco were married in Cowley county, Kansas, in the year 1890; both had been previously married. Mrs. Strom was the mother of ten living children, and Mr. Strom the father of 14 children, and both about 50 years of age. Mrs. Strom, at the time of the marriage was the owner of an interest in 80 acres of land in Cowley county, Kansas, the property of her former husband, which upon his death descended to her and her children, and she was residing upon the land with three of her minor children. Mrs. Strom was the owner of several horses, and seven or eight head of cattle, eight or ten hogs, and a number of chickens and some corn. After the marriage, she and Mr. Strom lived on the 80 acres of land with Mrs. Strom's two minor children, and they farmed the land for several years, supporting the two minor children of Mrs. Strom and a minor son of Mr. Strom from the fruits of their labor.

In the year 1893, Mr. Strom, at the opening of the Cherokee Strip, made the run and located upon 120 acres of land in Kay county. That same year the parties moved from Kansas to Oklahoma, settling upon the land, and Mr. Strom filed upon the same as his homestead. They brought with them from Kansas a team and a few head of cattle and a few hogs and a small amount of farm machinery and some furniture, of the approximate value of $150. There was a small house, about 12x14 feet, removed from the Kansas land to the farm in Kay county, which was thereafter sold. The parties lived upon the homestead in Kay county and Mr. Strom obtained a patent to the same and, about the year 1910, built a fairly good house and barn upon this land.

In 1911, the Kansas land was sold by Mrs. Strom and the children, and she received about $1,500. In regard to the disposition she made of this $1,500, the evidence discloses the same was deposited in a bank at Kaw City, and checked out by her, except approximately $250 which was in the bank at the time of her death. She executed a check for $100 to Mrs. Miller, and one for $100 to Mrs. Chandler, both her daughters, and one for $200 to her son-in-law, Art Passley. She bought a house and lot at Uncas, paying about $550 therefor, and one day went to the bank and executed a check payable to Mr. Strom, and instructed the banker to credit Mr. Strom's account with the $300. She made a loan of some money to a man by the name of Miller, and made a small donation to the church, and paid $50 to a party for husking corn.

In 1913, Mrs. Strom died, leaving a house and lot in Uncas, Okla., approximately $250 in the bank, and several small notes amount-

ing to about $100. Mr. Strom relinquished his interest or quitclaimed his interest in the Uncas property to the heirs. After the death of Mrs. Strom, he continued to live on the farm, and made his home a part of the time with one of his step-daughters, to wit, one of Mrs. Strom's daughters, and a portion of the time with his own · daughter, who lived in Kansas. During his lifetime he made a will bequeathing the land in question, his homestead, to his own children, and to the stepdaughter with whom he made his home, share and share alike.

This suit is brought by the administrator of Susan S. Strom to enforce an antenuptial contract claimed to have been entered into between Mr. and Mrs. Strom prior to their marriage, contending that the antenuptial agreement provided that the property belonging to Mrs. Strom should at her death be her property, and that the property accumulated thereafter should be equally divided between the heirs of Mrs. Strom and Mr. Strom. The petition further contended that Mrs. Strom had advanced the money to prove up the homestead and had paid the purchase price therefor, and that Mr. Strom held the title in trust for her. It was contended the antenuptial contract was lost or destroyed, and, for the purpose of proving the execution of the contract and the terms of the same, several witnesses, the children of Mrs. Strom, were produced, who testified they had read said contract. One witness purported to be present at the time the same was executed. One or two other witnesses testified that they were present when portions of such a contract were read, but did not know whether the contract was signed or not, but heard the contract talked about.

Mr. Strom's deposition was taken prior to his death, and he denied that any such contract had been entered into. Upon trial of the case to the court, the court, in passing upon the evidence, stated as follows:

"I believe there has been sufficient evidence here to find that there was an antenuptial contract made and that contract provided that a division of the property accumulated during their married life should be made. I do not believe that contract was in conflict with the federal homestead laws. If he had died first, she surely would have been entitled to her interest in that property, or had she sued for a divorce, she would have been entitled to her share of the property. There is no question about that. I don't believe that contract was in conflict with the homestead laws, and the finding of the court is that the personal property be left as it is; I think that perhaps has been divided and used up, and they have each perhaps had the benefit from that, probably about equally, and that the land out here—

whatever the numbers are—be declared the equal property of the Probasco children and the Strom children; that it be divided equally between the families; that is, the Stroms take one-half and the Probascoes take one-half."

Thereupon the court rendered judgment that the real estate be divided, one-half to the heirs of Susan Strom and one-half to the heirs of Mr. Strom. From said judgment, John E. Hoefer, executor of the estate of Joseph Strom, has appealed to this court. For reversal, there are numerous assignments of error urged. One goes to the sufficiency of the evidence to support the judgment of the court.

Upon the question of whether there was an antenuptial contract between the parties prior to their marrige, the evidence upon this question is conflicting and we are unable to say that the finding of the court upon this question is clearly against the weight of the evidence. The evidence regarding the provisions and terms of the contract is not clear and unambiguous, nor is the finding of the court unambiguous as to the exact terms and provisions contained in the contract. The only evidence as to the terms and provisions of the contract was the evidence of Frank Probasco and his brother, William Probasco, both sons of Susan S. Probasco. The testimony of William Probasco as to the terms and provisions of the contract is as follows:

"A. Well, she named over on the contract everything she had, even to chickens and everything that she owned at the time, and they was to—if he signed this contract—or if he signed a contract, they was to marry and if they got married what she had at the time, it was put on this contract, that at her death or his, whoever died first, this was hers; this part of it, what she had at the time, but the increase of this was to be divided; what he had was his at either one of their deaths. * * * A. Well, as near as I can remember that contract was just drawed up stating the amount of everything that she had in the stock line the same as was in that book right there and if she died first what was there belonged to her or hers and what was sold, the proceeds of that, increase, was to be divided, what the increase was; whoever died first what he had was to be his and naming all the stuff. Now that is as near as I can remember the contract. Q. That is all that you remember of that contract? A. I said that was as near as I can remember the contract. Q. You don't remember anything else in that contract? A. No, I don't think I do."

Frank Probasco testified regarding the terms of the contract as follows:

"A. Well, it was a list of the property that

she had when she married him and at her death he was to make good what she had, that is, what she had at the marriage and what they accumulated after marriage, it was to be equally divided between her heirs and his heirs, is my recollection of it. Q. That is, what was accumulated was to be divided between her heirs and his heirs when either one of them died? Is that it? A. Yes. * * * Q. What did the contract say about her property or what should be done with it, if anything? A. Well, if she died, first, the amount of property or the substance of that was to go to her heirs and then what was accumulated between the two was to be equally divided between his heirs and her heirs. Q. Did it say anything about his property? A. Well, his property; that is, what he had at the marriage, was to go to his heirs. The Court: What he had at that time? A. What he had when they were married was to go to his heirs and what she had when they were married was to go to her heirs and what they accumulated afterwards was to be equally divided. * * * A. That they were to—that their heirs were to have what they had when they were married, that is, mother's heirs was to have what she had and Joe's heirs was to have what he had at the time and Joe was to have possession of all her property at that time and at her death her heirs was to have what she had at the time of their marriage and the increase or accumulation, whatever they accumulated, was to be equally divided between them, between his heirs and her heirs. * * * A. Yes, sir; while they lived everything that was disposed of was to be equally divided; that is, what accumulated; everything that accumulated, whenever there was anything sold off the place mother was to have half of what it brought and him half, but what she had at the time of her marriage that was to be used; that was turned over to him to be used. Q. That is, in other words, he was to go on there as the father and take charge of that place and provide for her and the children that were there? A. Yes, sir. Q. And farm that land and take care of the stock and raise stock, etc., and support the family? A. Yes, sir. Q. And use the proceeds for the support of the family and divide up in the way you have stated here?"

This is the only evidence in the record to disclose what the terms and provisions of the contract really were. In order that we may properly determine the exact provisions of the contract and what force and effect to be given to said contract, it is necessary to consider certain rules of law that are applicable to antenuptial contracts. The first rule is to ascertain the intent of the parties in making the agreement, as it must govern if the same can be ascertained from the contract. This rule is stated in 13 R. C. L. 1020, as follows:

"However informal the instrument may be, it will be given effect if the intention of the parties is manifested, and it is such as can, in law or in equity, be executed. The courts look with favor on marriage settlements or agreements therefor, though unskillfully drawn, so long as they are bona fide. As has been well said, equity pays no attention to the externals, but considers only the substantial intention of the parties; and in fact a court of equity may totally disregard the form, if the intention of the parties in making the agreement can be ascertained."

The next question involved in this case is, by virtue of the contract being entered into in Kansas, where subsequent thereto one of the parties acquired a homestead in Oklahoma, does the antenuptial contract include the after-acquired property in this state? The rule applicable, in so far as it relates to real estate, is announced in 13 R. C. L. 1020, as follows:

"Where there has been a change of domicile after the making of an express nuptial contract, the better view seems to be that the law of the after-acquired domicile will govern, as to all after acquired property, unless the contract was made in view of a change of domicile, or such an event was in the contemplation of the parties, or the intention was in some way manifest, that the contract should govern as to the rights of property of the parties, wherever they might reside."

The Supreme Court of Washington, in a case very similar to the one at bar, in construing the contract in the case of Clark v. Baker, 135 Pac. 1025, stated as follows:

"Where it is desired to provide by an antenuptial contract for property acquired in a state foreign to the place of the contract, subsequent to the making of the contract, the contract must speak to the very point, that is, it must use words making the contract specifically applicable to property so acquired."

The Supreme Court of Texas, in the case of Castro v. Illies, 22 Tex. 479, 73 Am. Dec. 277, stated as follows:

"Where there has been change of domicile after making of express nuptial contract, the law of the after-acquired domicile will govern as to all after-acquired property, unless where the contract was made with reference to that law, or in view of a change of domicile, and it was the intention of the parties that the contract should govern wherever they should reside."

This same rule is announced in the following cases: Long v. Hess, 154 Ill. 482, 40 N. E. 335, 27 L. R. A. 791, 45 Am. St. Rep. 143; Kneeland v. Ensley, Meigs (Tenn.) 620, 33 Am. Dec. 168.

The question frequently encountered in

cases of this kind, where an antenuptial contract is made in one state and property is acquired subsequent thereto in another state, is to determine what particular property is within the scope of the agreement, and in determining what property is within the scope of the agreement the question is primarily one of intention of the parties, to be gathered from the instrument in the light of the surrounding circumstances. From the very nature of the question it depends very largely upon the terms of the particular agreement and the conditions existing at the time of its execution.

With the law as stated above relating to antenuptial contracts in mind, let us consider the evidence, first with a view of arriving at the intent of the parties. The testimony discloses that the parties at the time of the antenuptial contract were dealing with the personal property of Mrs. Strom and her interest in the land in Kansas and the increase or accumulation therefrom.

Both witnesses testified that the contract enumerated the personal property that Mrs. Strom owned. Mr. Strom owned no property at that time, but had about $80 in cash. In substance, the testimony of William Probasco was as follows: First, that the personal property owned by Mrs. Strom was mentioned in the contract, and whoever died first, it was to be her property. The increase from that property was to be divided between her heirs and his heirs. The stock was to remain her property, and whatever was sold the proceeds of the increase was to be equally divided between Mrs. Strom and Mr. Strom.

Frank Probasco testified that Mr. Strom was to go on the place as a father, and take charge of the farm, provide for Mrs. Strom and the children, take care of the stock and raise it, and support the family, and the proceeds were to be used, first, for the support of the family, and whatever was sold off the farm, Mrs. Strom was to have one-half and Mr. Strom was to have one-half, but Mrs. Strom was to have what she had at the time of her marriage. In our judgment, the intent of the parties as disclosed by this evidence was to deal solely with the personal property in Kansas. Whether it includes the real estate in Kansas is immaterial, as that property is not involved; but regarding the personal property, the parties agreed that the same should remain the property of Mrs. Strom and her children, and Mr. Strom was to work the farm and use the personal property, and if there was any surplus from the crops raised, and the increase from the stock, it was to be equally divided, and at their death was to be equally divided between their heirs. This contract contemplated that the parties should occupy the land owned by Mrs. Strom, and her children, and was fixing the rights of the parties in so far as it related to the personal property enumerated and the accumulations from that farm.

Let us now consider the next proposition of law and apply it to the contract as testified to and see if the evidence discloses that there was an intent of the parties to change their domicile, or that any such a change was contemplated by the parties and whether this is manifest from the contract, or the surrounding circumstances, and whether it was intended that the contract should govern the rights of the parties to real property acquired in Oklahoma.

In our judgment, there is no evidence of this kind and character, no inference that can be drawn from the same, and the evidence fails to bring this contract within the principles above announced, as it does not disclose that the parties contemplated a change of domicile, and it does not appear that the contract was made in view of a change of domicile, and there is nothing to disclose that the contract was intended to control their rights in real property acquired in another state, and, if so, the law of this state, and not the contract, will govern the descent of the real property acquired in this state.

The evidence, as heretofore stated, disclosed that certain personal property was brought from the Kansas farm to Oklahoma of the approximate value of $150. The trial court, in disposing of the rights of the parties concerning the personal property, held that the same had been divided up and disposed of and the court made no decree regarding the personal property, and no cross-appeal has been taken from that part of the judgment, so that question is not before us.

The plaintiffs in error contend that the antenuptial contract was void if it was intended to apply to the land in question, being in violation of the homestead law of the United States, and cite the cases of Brewster v. Madden, 15 Kan. 249; Brake v. Bellew, 19 Kan. 397; Mellison v. Allen, 30 Kan. 382, 2 Pac. 97, and May Wheeler v. James Widener, 75 Okla. 292, 183 Pac. 407. Defendant in error, however, contends to the contrary; that the same is not in violation of the homestead laws, and that the case comes squarely within the rule announced in the cases of Barlow v. Barlow (Kan.) 28 Pac. 607; McElhaney v. McElhaney (Iowa) 101 N. W. 90; Myers v. Croft, 13 Wall. 291, 20

L. Ed. 562, and Irvine v. Marshall, 15 L. Ed. 994. We think none of these cases have any application to the facts in the case at bar, as the cases cited all relate to contracts that were made relating to a homestead to be thereafter acquired, and the contracts entered into all related to the homestead to be thereafter acquired and it was within contemplation of the parties at the time of making the contract. These cases, in our judgment, have no application to the facts in this case, as the evidence here discloses the acquiring of a homestead was not even contemplated by the parties at the time, but the contract related to certain property owned by one of the parties at the time, and the increase and accumulations therefrom.

Defendant in error has briefed the case upon another theory—that the evidence disclosed facts upon which the court would declare a resulting trust—and cites cases supporting the theory that where one party pays the purchase price for land and the title is taken in the name of another, the land is held in trust for the party paying the purchase price. We think this line of cases has no application to the facts as disclosed by the record. We therefore conclude that, while the evidence is sufficient to support a finding that an antenuptial contract was entered into, the evidence is not sufficient to show that the homestead thereafter acquired by the husband in Oklahoma was within the scope of the agreement as contemplated by the parties, and there is nothing in the contract as proven or the surrounding circumstances to disclose that this contract was intended to include or control property thereafter acquired in another state.

For the reasons stated, the judgment of the trial court is reversed, and the cause remanded, with instructions to dismiss plaintiff's petition at the cost of plaintiff.

HARRISON, C. J., and PITCHFORD, ELTING, and NICHOLSON, JJ., concur.